231 Cal.App.2d 460 (1964)
THE PEOPLE, Plaintiff and Respondent,
v.
RICHARD LEROY GUYETTE, Defendant and Appellant.
Crim. No. 127. 
California Court of Appeals. Fifth Dist. 
Dec. 23, 1964.
 Lester J. Gendron, under appointment by the District Court of Appeal, for Defendant and Appellant.
 Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Daniel J. Kremer, Deputy Attorney General, for Plaintiff and Respondent.
 CONLEY, P. J.
 The defendant, Richard Leroy Guyette, appeals from a judgment of conviction, after trial by jury, for the possession of a sawed-off shotgun (Pen. Code, 12020).
 This excursion into crime had its commencement in the little community of McKinleyville in Humboldt County when the defendant and two women companions entered into a conspiracy to rob a bank. Mrs. Peggy Ede wanted money with which to get a divorce and to buy a car and Juanita Hagquist and the defendant just needed money generally in view of its manifold utility. In order to get the money they thought the easiest and best way was to rob a bank located near Santa Rosa.
 They left the Eureka country, after the women passed several fictitious checks there, and arrived in the City of Madera by bus about the 24th of February, 1964. They went to the Yosemite Hotel and procured a room for the three of them, the defendant registering for himself and Mrs. Ede as Mr. and Mrs. D. Anderson; those two were supposed to be married to each other, and Mrs. Hagquist posed as a baby-sitter. Two days afterwards they went to Bruno's store in Madera where Mrs. Ede stated that she wished to buy a 12- gauge shotgun for an "imaginary" 10-year-old son. Mr. Baratta said that he thought such a gun would be too large for a 10-year-old boy and recommended instead a 410-gauge model. The mother of Mr. Bruno Baratta heard Mrs. Ede talking to Guyette at the gun rack where she urged him to pick out the weapon himself because he was the one who was going to use it. He did choose the gun; Mrs. Ede "paid" for it with a fictitious check which had been furnished her by Mrs. Hagquist. *463
 The conspirators took the gun back to the hotel room where the women held the weapon in a tight grip while Guyette sawed off the barrel and cut a portion from the butt. The barrel of the altered shotgun then measured 14 inches. The weapon was broken down into its three component parts, wrapped in a paper bag, and placed in a suitcase containing appellant's clothing. The three persons bought a number of other articles of property about town, including suitcases and clothing, with fictitious checks executed by the women.
 On February 28, 1964, appellant and his two companions were arrested on check charges near the Yosemite Hotel, and were taken to the Madera Police Department where they were interrogated separately by Sergeant Virgil Van Curen. He first questioned Mrs. Ede and then appellant, but said nothing to either of them about going to the hotel room which they had jointly occupied. When he came to Mrs. Hagquist, Sergeant Van Curen requested her to empty the contents of her purse onto a table; she complied and the questioning continued; about 10 minutes later, Mrs. Hagquist told the officer that one of the fictitious checks had been cashed at Bruno's sporting goods store, and Van Curen asked if there were any guns purchased there which were presently in the hotel room. Mrs. Hagquist replied that there was a shotgun there. Sergeant Van Curen stated that he would have to get into the room. Thereupon, Mrs. Hagquist removed the key to the room from her waistband and without a word tossed it onto the table near Sergeant Van Curen. He picked up the key and continued the questioning for another 10 minutes. No further mention was made of the key, or of the room, other than the sergeant's statement that he probably could have gotten into the room even without the key. Sergeant Van Curen testified that he thought Mrs. Hagquist's action constituted permission by her to search the hotel room and that if she had not so given permission he would have applied to the court for a search warrant. Shortly thereafter, Sergeant Van Curen and another police officer, together with the woman in charge of the Yosemite Hotel, entered the hotel room which had been jointly occupied by the three conspirators; he there opened a suitcase which contained the defendant's clothing and the sawed-off shotgun.
 Appellant's contention is that the sawed-off shotgun was found during an unlawful search and seizure and that, therefore, it could not be used in evidence against him (People v. Cahan, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]). *464
 [1] The law of California is clear that a cotenant may authorize the entry and search of premises shared with another; a joint occupant of a room or building, or one of those in possession, may give consent to the entry and search. (People v. Kinard, 210 Cal.App.2d 85, 86-87 [26 Cal.Rptr. 377]; People v. Amado, 208 Cal.App.2d 780, 781 [25 Cal.Rptr. 539]; People v. Smith, 183 Cal.App.2d 670, 671 [6 Cal.Rptr. 866]; People v. Howard, 166 Cal.App.2d 638, 651 [334 P.2d 105]; People v. Silva, 140 Cal.App.2d 791 [295 P.2d 942].)
 [2, 3] However, the defendant stoutly maintains that Mrs. Hagquist herself did not consent to the entry. This was a matter for the trial court to decide preliminarily to the admission of the evidence; the court, and not the jury, properly ruled on the question (People v. Gorg, 45 Cal.2d 776, 778 [291 P.2d 469]; People v. Albert, 182 Cal.App.2d 729, 739 [6 Cal.Rptr. 473]; People v. Lucas, 180 Cal.App.2d 723, 726 [4 Cal.Rptr. 798]; People v. Caritativo, 46 Cal.2d 68, 73 [292 P.2d 513]); if the ruling of the trial court is supported by substantial evidence it should be accepted as final (People v. Michael, 45 Cal.2d 751 [290 P.2d 852]; People v. Jackson, 191 Cal.App.2d 296, 300 [12 Cal.Rptr. 748]; People v. Hood, 149 Cal.App.2d 836, 838 [309 P.2d 135]). [4a] The trial court had ample evidence from which to reach the conclusion that Mrs. Hagquist gave consent to the entry of the room. She had had possession of the key on behalf of all of the defendants, and instead of carrying it in her purse, she hid it in her belt. When the sergeant of police told her in the course of conversation that it would be necessary for him to enter the room, she threw the key on the table in front of him without a word. Such a gesture would lead a reasonable person in the circumstances to conclude that she consented that he should use the key, enter the room, and conduct the search. It should be remembered that prior to that time, she had indicated that the three had purchased a shotgun through the use of a fictitious check and the sergeant was then concerned primarily with retrieving the goods, including the gun, which had been bought with the worthless forgeries. Sergeant Van Curen had merely stated that sooner or later he would have to get into the room; he testified that he would have applied to the courts for a search warrant unless Mrs. Hagquist had given her consent.
 It would be difficult to find an implied consent more clearly *465 proven. [5] The law is positive that an affirmative consent to enter may be established by the acts of the person in charge entirely aside from the use of words.
 People v. Baca, 198 Cal.App.2d 391, 396 [17 Cal.Rptr. 779], thus states the general principle: "... consent to enter may be indicated by actions as well as by words."
 In People v. Cove, 228 Cal.App.2d 466, 470 [39 Cal.Rptr. 535], it is stated: "After Officer Lyons knocked at the door and identified himself, defendant quickly secreted the gun, threw open the door, stepped back and claimed absence of any disturbance. This course of conduct was an implied invitation to Lyons to step inside and to satisfy himself that conditions conformed precisely to defendant's claim, i.e., no disturbance. The officer was entitled to regard defendant's gestures as an implied invitation to enter. [Citations.] Lawful entry, 'the indispensable predicate of a reasonable search,' had been established."
 The opinion in People v. Smyre, 164 Cal.App.2d 218, 224 [330 P.2d 489], has the following to say with respect to a similar implied invitation: "After they knocked on the door and stated their purpose, Mary Frazer opened the door a few inches. Upon seeing the officers, she opened the door further, stepped back and sat down on the bed. Under these circumstances she clearly consented to the entry of the officers. She was the person with proper authority to give consent. There is nothing in the record to indicate that her consent was anything but voluntary. The question of her consent was a question of fact properly left to the trial court. Her expression of assent to the officers and her action in opening the door suggests an affirmative invitation to the officers to enter. (People v. Holland, 148 Cal.App.2d 933 [307 P.2d 703].)"
 "The entry of the officers into the room was made with proper consent and not unlawful. (People v. Burke, 47 Cal.2d 45 [301 P.2d 241]; People v. Michael, 45 Cal.2d 751 [290 P.2d 852]; People v. Bouchard, 161 Cal.App. 302 [326 P.2d 646].)"
 [6] Nothing in the record indicates that Mrs. Hagquist's consent was coerced. It is true that she was in custody at the time, but under the authorities that is merely a fact among others to be considered by the trial court and is not in itself determinative (People v. Fischer, 49 Cal.2d 442, 448 [317 P.2d 967]; People v. Michael, supra, 45 Cal.2d 751; People v. Lujan, 141 Cal.App.2d 143, 147 [296 P.2d 93]; *466 People v. Lucas, supra, 180 Cal.App.2d 723, 726). [4b] There is nothing which suggests that there was any threat or any promise made to her to induce her acquiescence. The trial court reached the reasonable conclusion that by her actions Mrs. Hagquist gave implied consent to the police to enter the room and conduct the search.
 [7] Appellant contends that the court erred by refusing to permit him to ask Mrs. Hagquist what in fact was her state of mind at the time she delivered the key. This ruling was correct technically, because it was the duty of the court to determine what Mrs. Hagquist appeared to do from her actions rather than from what she secretly thought. It was the objective, and not the subjective, occurrence that gave or denied the police consent to proceed (People v. Baca, supra, 198 Cal.App.2d 391; People v. Smyre, supra, 164 Cal.App.2d 218; People v. Cove, supra, 228 Cal.App.2d 466; People v. Corrao, 201 Cal.App.2d 848, 852 [20 Cal.Rptr. 492]; People v. Smith, supra, 183 Cal.App.2d 670).
 Appellant also contends that there was no showing of possession of the weapon by the defendant, inasmuch as the fictitious check for the purchase of the gun was made out by Mrs. Hagquist and passed by Mrs. Ede. However, ownership or exclusive possession is not a necessary requisite to prove possession of an article (People v. Felix, 58 Cal.App.2d 646 [137 P.2d 472]; People v. McKinney, 9 Cal.App.2d 523 [50 P.2d 827]; People v. Voss, 2 Cal.App.2d 188 [37 P.2d 846]). [8] It was the defendant's idea to purchase a shotgun and to convert it to a sawed-off weapon; he was present with the other two at the Bruno store and participated in the buying negotiations, including the selection of the gun from the rack; when it was taken to the hotel room it was converted into a sawed-off shotgun through his manipulation of a hacksaw, and it was afterwards placed in a suitcase containing his clothing. This proof was sufficient to hold him responsible. (See People v. Hamilton, 223 Cal.App.2d 542, 545 [35 Cal.Rptr. 812].) [9] In addition, the record, as above stated, shows that the three persons had previously entered into a conspiracy with objectives which included purchase of a shotgun and its conversion into a forbidden weapon, and anything done in furtherance of such conspiracy by any of the three was properly admissible as against each of them. (People v. Weiss, 50 Cal.2d 535, 563 [327 P.2d 527]; People v. Harper, 25 Cal.2d 862, 870 [156 P.2d 249]; People v. Waller, 14 Cal.2d 693, 703 [96 P.2d 344]; People v. Kauffman, *467 152 Cal. 331, 334 [92 P. 861]; 11 Cal.Jur.2d, Conspiracy, 31, p. 253 et seq.; 16 Am.Jur.2d, Conspiracy, 15, p. 135 et seq.)
 [10] Appellant next contends that as the sawed-off shotgun was not ready for immediate use, because it was broken down into its three component parts at the time of its discovery, no crime was committed. This contention is nugatory. The chief use for a sawed-off shotgun today is to rob a bank or commit a similar crime, and that is the reason that possession of such a weapon is forbidden by the Penal Code. The evidence indicated that the gun could be assembled and used in a matter of seconds. [11] The contention made by appellant is completely disposed of in People v. Williams, 100 Cal.App. 149 [279 P. 1040], a prosecution for possession of a disassembled slung-shot under the Deadly Weapon's Act, where the court says at page 151: "The rule is well settled that a deadly weapon does not cease to be such by becoming temporarily inefficient, nor is its essential character changed by dismemberment if the parts may be easily assembled so as to be effective. [Citations.]"
 [12] Finally, the appellant claims that the district attorney was guilty of prejudicial misconduct by introducing evidence that the three were guilty of a separate crime, conspiracy to obtain a sawed-off shotgun and to rob a bank. It was proper to prove a conspiracy in order to show that every act of any one of the conspirators in furtherance of the common plan was the act of each. And entirely apart from that factor, proof of motive for possession was proper. [13] As is said in People v. Canales, 12 Cal.App.2d 215, 220 [55 P.2d 289]: "... where there is a denial of the possession of the instrument any evidence which tends to show a motive or reason to possess such an instrument is admissible as bearing upon the fact of possession." (See also People v. Coefield, 37 Cal.2d 865, 870 [236 P.2d 570].)
 The judgment is affirmed.
 Brown (R. M.), J., and Stone, J., concurred.