965 P.2d 37

**STATE of Arizona, Appellee,**

v.

**Kelvin Tyrone YOUNG, Appellant.**

**No. 1 CA–CR 96–0806.**

Court of Appeals of Arizona,
Division 1, Department E.

Feb. 19, 1998.

As Amended May 7, 1998.

Review Denied Oct. 20, 1998.

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section and Susanna C. Pineda, Assistant Attorney General, Phoenix, for Appellee.

Dean W. Trebesch, Maricopa County Public Defender by Louise Stark, Deputy Public Defender, Phoenix, for Appellant.

FIDEL, Presiding Judge.

¶ 1 Defendant Kelvin T. Young appeals his conviction for knowingly possessing a prohibited weapon—a shotgun that had been sawed off to an overall length and a barrel length that were shorter than Arizona law permits. The shotgun, though disassembled and inoperable, was not irreparably so. We consider on appeal, among other issues, whether, to prove the culpable mental state of knowing possession of a prohibited weapon, the State must establish a defendant's knowledge (1) of the prohibited characteristics of the weapon or (2) that the weapon is not permanently inoperable.

## I. BACKGROUND

¶ 2 When Phoenix police officers went to Defendant's residence to investigate an unrelated crime, Defendant's mother gave them permission to conduct a search. In Defendant's bedroom under the mattress, a police officer found a .410 gauge shotgun in three pieces: forestock, rearstock, and trigger. Because the barrel was sawed off and seemed shorter than Arizona law allows, Offi-

cer Hopper impounded the weapon for further investigation.[1]

¶ 3 After the search, the officers advised Defendant of his *Miranda* rights and interviewed him. Defendant denied sawing off the shotgun barrel, stating that he had found the shotgun in the same condition six months earlier and did not know that it was shorter than the law permits. Its length did not matter, he added, because he had tried to fire it and it wouldn't work. He asked the officers to return the shotgun if they found it not unlawfully short.

¶ 4 Melvin Garrett, a City of Phoenix criminalist, assembled the shotgun. At first the disassembled pieces would not fit; but when Garrett discovered that the bolt inside the barrel was upside down, he unscrewed and righted the bolt and fit the parts together easily. The assembled shotgun was 21 and 3/8 inches long; its barrel was 12 and 5/8 inches long. Neither dimension met the requirements of Arizona Revised Statutes Annotated ("A.R.S.") § 13–3101(7)(d) (Supp. 1997), which prohibits possession of shotguns less than 26 inches long and those with barrels less than 18 inches long.

¶ 5 Garrett unsuccessfully test-fired the shotgun and discovered that its firing pin was too short. To determine whether the shotgun was permanently inoperable,[2] he rigged up a longer firing pin by cutting a bolt, drilling a hole in it, and gluing a short piece of coat hanger into the hole. With this improvised firing pin, Garrett fired the shotgun. To improve the firing, he shortened the pin and added a spring and spring-keeper assembled from a screw, a paper clip, and the frame of a ballpoint pen. The shotgun could be fired without the spring and keeper, but worked better with them.

¶ 6 It took Garrett approximately 1 hour at home to build the firing pin and approximately 1/2 hour at his lab to put the finishing touches on it. He used a hacksaw to cut the bolt, a grinder to smooth the ends, a drill to make the hole, superglue to hold the coat

---

1. In the same bedroom, an officer found shotgun shells, but these were later determined not to fit in the impounded shotgun.

2. A former firearm that is now "in permanently inoperable condition" does not constitute a "firearm" for the purpose of Arizona weapons law. A.R.S. § 13–3101(4) (1989 & Supp.1997).

hanger in the hole, and a Dremel tool to cut the slot. Based upon his examination and reconstructive effort, Garrett concluded that the shotgun was not permanently inoperable.

¶ 7 Defendant testified at trial. He said he was given the shotgun three years ago by his father, a junk collector, and had kept it as a souvenir. He said he never tried to assemble it; someone else who tried to do so had told him it wouldn't work. Nor had Defendant ever tried to repair it. Defendant said he knew what a firing pin is, but not a spring or a keeper. He lacked the tools to make a firing pin and could not fix the shotgun himself. He had put the shotgun under his mattress to keep it away from his nieces and nephews.

¶ 8 Defendant was convicted of knowing possession of a prohibited weapon, one form of misconduct involving weapons, a class 4 felony pursuant to A.R.S. § 13–3102(A)(3). His sentence was suspended and he was placed on probation for 18 months. On appeal, he raises the following issues:

1. Was the disassembled, inoperable shotgun a prohibited weapon under A.R.S. § 13–3101(7)(d)?

2. Does A.R.S. § 13–3102(A)(3) require proof that Defendant knew the shotgun was not permanently inoperable?

3. Does A.R.S. § 13–3102(A)(3) require proof that Defendant knew the shotgun had characteristics that made it a prohibited weapon under A.R.S. § 13–3101(7)(d)?

4. Did the trial court commit fundamental error by giving the reasonable doubt instruction recommended in *State v. Portillo*, 182 Ariz. 592, 898 P.2d 970 (1995)?

5. Did the trial court abuse its discretion by denying a motion for mistrial after a police officer testified that he was part of a gang squad?

## II. OPERABILITY

¶ 9 Defendant was convicted of violating A.R.S. § 13–3102(A)(3), under which "[a] person commits misconduct involving weapons by knowingly ... possessing ... a prohibited weapon." A "prohibited weapon" includes a

> shotgun with a barrel length of less than eighteen inches, or any firearm made from a ... shotgun which, as modified, has an overall length of less than twenty-six inches.

A.R.S. § 13–3101(7)(d) (Supp.1997). A "firearm" consists of

> any loaded or unloaded ... shotgun or other weapon which will or is designed to or may readily· be converted to expel a projectile by the action of an explosive, except that it does not include a firearm in permanently inoperable condition.

A.R.S. § 13–3101(4) (1989 & Supp.1997); *see also* A.R.S. § 13–105(17) (Supp.1997).

¶ 10 Defendant acknowledges that neither the reassembled shotgun nor its barrel was long enough to meet the requirements of A.R.S. § 13–3101(7)(d). Yet he maintains that the shotgun was not a statutorily prohibited weapon because its disassembled pieces did not constitute an operable whole. We disagree.

¶ 11 A statutory firearm under A.R.S. § 13–3101(4) is one designed to expel a projectile by the action of an explosive. The statute makes an exception for firearms in "permanently inoperable condition." Courts construing similar statutes hold generally that a disassembled or broken weapon falls within the applicable definition of prohibited weapon if it can be made operable with reasonable preparation, including the addition of a readily replaceable part or the accomplishment of a quickly-effected repair.[3] Division Two of this court has held specifically that a weapon with a missing but replacea-

---

3. *See generally People v. Guyette*, 231 Cal.App.2d 460, 41 Cal.Rptr. 875 (1964) (disassembled but readily assemblable shotgun does not lose its essential character); *People v. Hill*, 433 Mich. 464, 446 N.W.2d 140 (1989) (one who possesses only components can be convicted of possession of short-barreled shotgun if shotgun could be reassembled and made operable within reasonable period of time); *State v. Gantt*, 101 N.J. 573,

503 A.2d 849 (1986) (one can be guilty of unlawful possession of firearm, even if weapon is temporarily non-functional and in disrepair, if weapon was designed to fire, and can be repaired to fire, potentially deadly missile); Jeffrey F. Ghent, Annotation, *Fact that Gun Was Broken, Dismantled, or Inoperable as Affecting Criminal Responsibility Under Weapons Statute*, 81 A.L.R.4th 745 (1990).

ble firing pin is only temporarily, not permanently, inoperable. *See State v. Fisher,* 126 Ariz. 50, 50, 612 P.2d 506, 506 (App.1980); *State v. Spratt,* 126 Ariz. 184, 186, 613 P.2d 848, 850 (App.1980).

¶ 12 Similarly, a broken weapon that needs repair may constitute a firearm if it can be readily restored to operability. *See United States v. Catanzaro,* 368 F.Supp. 450, 452–53 (D.Conn.1973) (with replacement parts identifiable in a standard firearms reference book available from the manufacturer for fifteen dollars, sawed-off shotgun met applicable statutory definition of a weapon that "may be readily restored to fire"); *Dampier v. State,* 596 So.2d 515, 516–17 (Fla. Dist.Ct.App.1992) (short-barreled shotgun qualified as prohibited weapon, though "frozen closed" by rust, because, without special knowledge or great expense, by simple application of oil, it could be broken open, loaded, and fired); *cf. United States v. Seven Miscellaneous Firearms,* 503 F.Supp. 565, 573–75 (D.D.C.1980) (weapon not "readily restored to fire" under federal statute where restoration required master gunsmith working in gun shop for thirty hours using tools and equipment costing $65,000).

¶ 13 Whether a weapon is permanently inoperable is a question of fact. *See, e.g., People v. Vigil,* 758 P.2d 670, 674 (Colo. 1988) (in considering whether a weapon can be made operable with reasonable preparation, the fact-finder "must weigh a variety of factors including 'the time required, the changes that have to be made in the weapon, the parts which have to be inserted and all the other attendant factors and circumstances.'" (citation omitted)); *Commonwealth v. Bartholomew,* 326 Mass. 218, 93 N.E.2d 551, 553 (1950) (it is for the jury to decide whether weapon is so defective or damaged that it loses its character as a firearm).

¶ 14 In this case, the evidence showed that the three parts of Defendant's shotgun could be easily reassembled by readjusting a bolt and that the assembled shotgun could be made operable by replacing the firing pin, which could be constructed by a relatively simple process from an ordinary bolt, a coat hanger, and household tools.

This evidence was properly left to the evaluation of the jury, and it permitted the jury to conclude that Defendant's firearm was not permanently inoperable within the meaning of A.R.S. § 13–3101(4).

### III. Knowledge of Operability

¶ 15 Defendant argues that the State was obliged, and failed, to prove he knew the weapon was not permanently inoperable. We disagree. Under Arizona law, "ignorance or a mistaken belief as to a matter of fact does not relieve a person of criminal liability unless ... [i]t negates the culpable mental state required for commission of the offense." A.R.S. § 13–204(A)(1) (1989).

¶ 16 Operability of the weapon is not an element of the offense of knowingly possessing a prohibited weapon; rather, permanent inoperability is an affirmative defense to that, as to other, firearm offenses. *See State v. Valles,* 162 Ariz. 1, 7, 780 P.2d 1049, 1055 (1989); *State v. Berryman,* 178 Ariz. 617, 621, 875 P.2d 850, 854 (App.1994). If operability is not an element of the offense, neither can *knowledge* of operability be an element of the offense. Knowledge of operability was not part of the culpable mental state that the State was obliged to prove.

### IV. Knowledge of Prohibited Characteristics of Weapon

¶ 17 A harder question arises with respect to the prohibited characteristics—the offending overall length and barrel length—of Defendant's shotgun. We have discussed the statutory declaration that "ignorance or a mistaken belief as to a matter of fact does not relieve a person of criminal liability unless ... [i]t negates the culpable mental state required for commission of the offense." A.R.S. § 13–204(A)(1). It follows that ignorance or a mistaken belief as to a matter of fact *does* relieve a person of criminal liability if it negates the culpable mental state required for commission of the offense. The offending overall length and barrel length of Defendant's shotgun *were* elements of the crime that he committed; they rendered his shotgun a prohibited weapon. The question thus arises whether they were also elements

of the "knowing" culpable mental state for the crime of possession of a prohibited weapon. Defendant argues that they were. Specifically, he argues that the State did not meet its burden by proving merely that he knowingly possessed a weapon that turned out to have prohibited characteristics; the State was further obliged, and failed, to prove that he knew "the barrel was less than 13 inches long, or that the combined length was under 26 [inches] with the stock."

¶ 18 To evaluate Defendant's argument, we first consider A.R.S. § 13–202(A), which provides:

> If a statute defining an offense prescribes a culpable mental state that is sufficient for commission of the offense without distinguishing among the elements of such offense, the prescribed mental state shall apply to each such element unless a contrary legislative purpose plainly appears.

Upon first glance, this statute seems to favor Defendant's position. A.R.S. § 13–3102(A) (Supp.1997) provides as to prohibited weapons:

> A person commits misconduct involving weapons by knowingly:
>
> . . . .
>
> 3. Manufacturing, possessing, transporting, selling or transferring a prohibited weapon[.]

4. A.R.S. § 13–3102(A) (Supp.1997) provides:
   A. A person commits misconduct involving weapons by knowingly:
   1. Carrying a deadly weapon without a permit pursuant to § 13–3112 except a pocket knife concealed on his person; or
   2. Carrying a deadly weapon without a permit pursuant to § 13–3112 concealed within immediate control of any person in or on a means of transportation; or
   3. Manufacturing, possessing, transporting, selling or transferring a prohibited weapon; or
   4. Possessing a deadly weapon if such person is a prohibited possessor; or
   5. Selling or transferring a deadly weapon to a prohibited possessor; or
   6. Defacing a deadly weapon; or
   7. Possessing a defaced deadly weapon knowing the deadly weapon was defaced; or
   8. Using or possessing a deadly, weapon during the commission of any felony offense included in chapter 34 of this title; or
   9. Discharging a firearm at an occupied structure in order to assist, promote or further the interests of a criminal street gang, a criminal syndicate or a racketeering enterprise; or

In designating a knowing mental state for the commission of this offense, subsection 3 does not distinguish the actor's knowledge that he or she is manufacturing, possessing, transporting, selling, or transferring a weapon from the actor's knowledge of the prohibited nature or characteristics of the weapon. The absence of any express distinction between these elements suggests under § 13–202(A) that a knowing mental state must be proven as to both the act and the prohibited nature or characteristics of the weapon.

¶ 19 Further examination of the statute, however, puts this interpretation into doubt. The fourteen subsections of A.R.S. § 13–3102(A) list various forms of misconduct involving weapons.[4] Each subsection contains two components: (1) identification of forbidden acts, such as carrying, possessing, selling, or supplying; and (2) identification of the type of weapon—deadly, prohibited, or firearm—as to which such acts are forbidden. One subsection alone explicitly requires that the actor know that the weapon is of the forbidden type. Specifically, A.R.S. § 13–3102(A) provides as to defaced deadly weapons:

> A person commits misconduct involving weapons by knowingly:
>
> . . . .
>
> 10. Unless specifically authorized by law, entering any public establishment or attending any public event and carrying a deadly weapon on his person after a reasonable request by the operator of the establishment or the sponsor of the event or the sponsor's agent to remove his weapon and place it in the custody of the operator of the establishment or the sponsor of the event; or
> 11. Unless specifically authorized by law, entering an election polling place on the day of any election carrying a deadly weapon; or
> 12. Possessing a deadly weapon on school grounds; or
> 13. Unless specifically authorized by law, entering a commercial nuclear generating station carrying a deadly weapon on his person or within the immediate control of any person; or
> 14. Supplying, selling or giving possession or control of a firearm to another person if the person knows or has reason to know that the other person would use the firearm in the commission of any felony.

7. Possessing a defaced deadly weapon *knowing the deadly weapon was defaced* [.]

(emphasis added).[5] No other subsection adds such a requirement.

¶ 20 To illustrate the point, we may compare the crime of possession of a deadly defaced weapon under subsection 7 to the crime of possession of a prohibited weapon under subsection 3—the crime with which Defendant was charged. Both are crimes of possession. In subsection 7, however, the legislature supplemented the general requirement that the crime be knowingly committed by adding the specific requirement that the actor know the weapon is of a forbidden type—defaced. In subsection 3, in contrast, the legislature included no supplemental requirement with respect to knowledge of the weapon type.

¶ 21 We return to the question under A.R.S. § 13–202(A) whether the legislature, in defining a knowing culpable mental state for the commission of misconduct involving weapons, distinguished among elements of the crime. The contrast between subsection 7 and the remainder of the statute suggests that the legislature distinguished the actor's knowing commission of a forbidden act involving a weapon from the actor's knowledge of the forbidden characteristics of the weapon. *Cf. Kizzar v. Superior Court,* 246 Ariz. Adv. Rep. 22, 23, 191 Ariz. 135, 137, 953 P.2d 175, 177 (App.1997) (if legislature had intended statute to have different meaning, it would have used different language). It suggests, in other words, a legislative intent to relieve the State from proving the actor's knowledge that the weapon in possession was of a forbidden type except where proof of such knowledge is explicitly required.

¶ 22 Two previous Arizona decisions addressed related questions, but did not frame the precise question before us now. In *State v. Tyler,* 149 Ariz. 312, 718 P.2d 214 (App. 1986), the defendant knowingly possessed a sawed-off shotgun, but claimed it had been planted on his premises and that he took possession only to ensure its safe disposal.

In *State v. Harmon,* 25 Ariz.App. 137, 541 P.2d 600 (1975), the defendant knowingly possessed a pistol, but claimed not to know of a statute that prohibited such possession by persons previously convicted of a crime of violence. In each case this court concluded that the State was not obliged to establish that a defendant who knowingly possessed a weapon did so with criminal intent; in each case knowing possession sufficed to constitute the crime. *See Tyler,* 149 Ariz. at 316, 718 P.2d at 218; *Harmon,* 25 Ariz.App. at 139, 541 P.2d at 602. In neither case, however, did the court consider or address the question whether, in a prosecution for possession of a weapon with defined offending characteristics, the State must prove the defendant knew those characteristics.

¶ 23 More instructive for present purposes are *Staples v. United States,* 511 U.S. 600, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994), and *United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971). *Staples* concerned a prosecution for possession of an unregistered "machinegun" under the National Firearms Act, 26 U.S.C. § 5861(d) (1994). A machine gun "fires repeatedly with a single pull of the trigger"; a semiautomatic weapon "fires only one shot with each pull of the trigger." *Staples,* 511 U.S. at 602 n. 1, 114 S.Ct. at 1795 n. 1. Unregistered possession of the former is a federal offense; unregistered possession of the latter is not. *See* 26 U.S.C. §§ 5845(a)(6), (b). The defendant in *Staples* possessed a semiautomatic rifle that had been modified to permit automatic firing, but claimed to be unaware of its automatic firing capability. The trial court refused to instruct the jury that the government must prove the defendant knew the gun would fire fully automatically. *See Staples,* 511 U.S. at 604, 114 S.Ct. at 1796. The Supreme Court reversed the defendant's conviction, holding that the government was obliged to prove, and had failed to prove, that he knew the "offending characteristics" of his weapon. *See id.* at 620, 114 S.Ct. at 1804.

¶ 24 In *Freed,* however, a conviction under the National Firearms Act for possession

---

**5.** A defaced weapon is one whose serial number has been removed, altered, or destroyed. *See*

A.R.S. § 13–3101(2) (1989 & Supp.1997).

of unregistered grenades, the Court had rejected the assertion of the defendant, who knew he possessed grenades, that the government was obliged additionally to prove he knew the grenades were unregistered. The *Staples* Court attributed the less rigorous *mens rea* requirement in *Freed* to the "quasi-suspect" status of grenades. *See Staples*, 511 U.S. at 612, 114 S.Ct. at 1800.

> In such situations, we have reasoned that as long as a defendant knows that he is dealing with a dangerous device of a character that places him "in responsible relation to a public danger," ... he should be alerted to the probability of strict regulation, and we have assumed that in such cases Congress intended to place the burden on the defendant to "ascertain at his peril whether [his conduct] comes within the inhibition of the statute."

*Id.* at 607, 114 S.Ct. at 1798 (alteration in original) (citations omitted). Taking note of "a long tradition of widespread lawful gun ownership by private individuals in this country," the Court explained that this tradition "did not apply to the possession of hand grenades." *Id.* at 610, 114 S.Ct. at 1799. To weaken *mens rea* in the former case would "criminalize a broad range of apparently innocent conduct"; to do so in the latter case would not. *Id.*

¶ 25 In a pertinent caveat, however, the *Staples* Court added:

> As suggested above, despite their potential for harm, guns generally can be owned in perfect innocence. Of course, we might surely classify certain categories of guns— no doubt including the machineguns, *sawed-off shotguns*, and artillery pieces that Congress has subjected to regulation—as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed.*

*Id.* at 611–12, 114 S.Ct. at 1800 (emphasis added).[6]

¶ 26 Though *Staples* concerns a different statute than the one before us, we find its discussion of "quasi-suspect" weapons helpful to our identification of the requisite "knowing" culpable mental state for the Arizona crime of possession of a prohibited weapon. The *Staples* Court described its holding as a "narrow one ... [that] depends upon a commonsense evaluation of the nature of the particular device ... Congress has subjected to regulation." *Staples*, 511 U.S. at 619, 114 S.Ct. at 1804. We wish similarly to bring common sense to the analysis of our legislature's purpose in enacting A.R.S. § 13–3102(A).

¶ 27 Accompanying short-barreled shotguns among the "prohibited weapons" listed in A.R.S. § 13–3101(7) and proscribed in § 13–3102(A)(3) are such devices as explosives, incendiary or poison gasses, bombs, grenades, mines, silencers, machine guns, high-powered rockets, nunchakus, and molotov cocktails. These weapons and devices do not fall within "a long tradition of widespread lawful ... [private] ownership." *Staples*, 511 U.S. at 610, 114 S.Ct. at 1799. Short-barreled shotguns not only fall outside the tradition of lawful private ownership; as easily concealable weapons with a wide pattern of projectile distribution, they also pose a lethal danger. Further, they are readily identifiable by a possessor *as* short-barreled shotguns. This combination of ready identifiability, lethal danger, and the absence of a tradition of lawful ownership qualifies short-barreled shotguns generally as a kind of weapon whose nature and appearance might reasonably be expected to alert a possessor to the probability of strict regulation. *See id.* at 607, 114 S.Ct. at 1798. These characteristics, in our opinion, led the legislature to

---

**6.** Federal circuit courts have disagreed in applying *Staples* to prosecutions for possession of unregistered sawed-off shotguns under the National Firearms Act. *Compare United States v. Barr*, 32 F.3d 1320, 1323–24 (8th Cir.1994) (sawed-off shotgun is "quasi-suspect" and the government need only prove defendant possessed the "quasi-suspect" weapon and observed its characteristics), *with United States v. Edwards*, 90 F.3d 199, 204 (7th Cir.1996) (*Staples* requires the govern-

ment to prove defendant knew his shotgun was shorter than the prescribed length), *and United States v. Mains*, 33 F.3d 1222, 1229–30 (10th Cir.1994) (defendant must know length of shotgun barrel or overall length of gun to be convicted under Act). Like the court in *Barr*, we regard a sawed-off shotgun as a "quasi-suspect" weapon whose obvious, and obviously dangerous, characteristics should place the owner on notice of the likelihood of regulation.

include short-barreled shotguns within the list of statutorily prohibited weapons, and to omit any statutory requirement that the State prove a possessor's knowledge of the offending barrel or weapon length.

¶ 28    Consider once again the contrast between the crime of possession of a deadly *defaced weapon* under A.R.S. § 13–3102(A)(7) and the crime of possession of a short-barreled shotgun under (A)(3). For both crimes the legislature required proof of knowing possession of a weapon; for the former crime, the legislature added the requirement that the State prove knowledge of the offending condition; for the latter crime, it did not. The logic of this distinction is that the defacement of a weapon—the removal of its serial number—is not a conspicuous condition. A sawed-off or short-barreled shotgun is conspicuously so.

¶ 29    What then is the culpable mental state required to commit possession of a prohibited weapon under A.R.S. § 13–3102(A)(3)? Do these statutes create a strict liability offense and permit the attribution of a class 4 felony to anyone who possesses a collection of disparate parts that can be assembled into one of the devices identified in A.R.S. § 13–3101(7)? We think not.

■ ¶ 30    "Strict liability applies only where there is a clear legislative intent that the crime does not require *any* degree of mens rea." *State v. Williams*, 144 Ariz. 487, 488, 698 P.2d 732, 733 (1985) (emphasis added). Both common-law and statutorily created criminal offenses with no mental element "have a generally disfavored status." *Liparota v. United States*, 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985). Although strict liability may be appropriate to certain types of offenses in which the "penalties commonly are relatively small, and conviction does no grave damage to an offender's reputation," *Morissette v. United States*, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952), a violation of A.R.S. § 13–3102(A)(3) is a class 4 felony with potentially

severe punishment. *Cf. State v. Delgarito*, 189 Ariz. 58, 60, 938 P.2d 107, 109 (App.1997) (felony conviction imposes significant consequences and creates substantial deprivations for a defendant).[7] We do not believe the legislature intended to criminalize possession of a prohibited weapon under A.R.S. § 13–3102(A)(3) without proof of some level of knowledge of the object possessed. *See Staples*, 511 U.S. at 607–08 n. 3, 114 S.Ct. at 1798 n. 3 ("True strict liability might suggest that the defendant need not know even that he was dealing with a dangerous item.").

¶ 31    Some federal courts, after relieving the government of the more rigorous requirement of proving a defendant's knowledge of the specific offending characteristics of certain classes of suspect weapons, have identified a less rigorous scienter requirement. *See United States v. Farrell*, 69 F.3d 891, 894 (8th Cir.1995) (in prosecution for unlawful possession and transfer of statutory firearm under Firearms Owner's Protection Act, government need only prove defendant knowingly possessed a "quasi-suspect" weapon (machine gun) and observed its characteristics), *cert. denied* 516 U.S. 1181, 116 S.Ct. 1283, 134 L.Ed.2d 228 (1996); *Barr*, 32 F.3d at 1324 (in prosecution for unlawful possession of statutory firearm under National Firearms Act, the government need only prove the defendant knowingly possessed a "quasi-suspect" weapon (sawed-off shotgun) and observed its characteristics; it need not prove defendant knew his sawed-off shotgun was under the specific length permitted by law).

■ ¶ 32    We conclude that a similar level of knowledge must be proved to establish a culpable mental state for the purposes of A.R.S. §§ 13–3102(A)(3) and 13–3101(7)(d). Specifically, to prove Defendant's culpable mental state, the State was obliged to prove that Defendant knew he possessed a sawed-off or short-barreled shotgun. It was not obliged to prove that he knew the specific barrel or overall length that made it a statu-

---

**7.**  Strict liability is often applied to "public welfare offenses." Typical public welfare offenses involve control of particular industries, trades, or products that affect public health, safety, or welfare, such as maintaining pure food and drugs,

labeling, weights and measures, building codes, sanitation, and highway safety. *See* 1 Charles E. Torcia, *Wharton's Criminal Law* § 23, at 107–11 (14th ed.1978).

torily prohibited weapon under A.R.S. § 13-3101(7)(d).

¶ 33 Defendant did not argue at the trial court, nor has he argued on appeal, that he did not know that his weapon was a shotgun with a shortened barrel. Nor did Defendant argue at the trial court, nor has he argued on appeal, that the trial court inadequately instructed the jury concerning the elements of the crime.[8] Defendant has argued only, to reiterate, that the State was obliged to prove, and failed to prove, that he knew "the barrel was less than 13 inches long, or that the combined length was under 26 [inches] with the stock." Having rejected that argument, we find sufficient evidence to sustain the conviction.

¶ 34 According to the record, Defendant knew his assembled weapon was a shotgun. He admittedly knew its barrel had been sawed off, although he claimed he did not shorten it himself. Defendant told police he attempted to fire the shotgun. He had the opportunity to observe its physical characteristics, including its overall length and the length of the barrel. Although Defendant told the police he had found the shotgun six months before his arrest, he testified inconsistently at trial that his father gave it to him three years earlier. Defendant hid the shotgun under his bed. From this evidence and from the general nature and characteristics of his weapon, jurors could reasonably conclude that Defendant knowingly possessed a prohibited weapon within the meaning of A.R.S. §§ 13-3101(7)(d) and 13-3102(A)(3).

¶ 35 In summary, we conclude that the State was not required to prove that Defendant knew the length of his shotgun or its barrel, and we hold that the State produced adequate evidence to support his conviction for the knowing possession of a prohibited weapon.

8. Without objection, the jury was instructed:
The crime of misconduct involving weapons requires proof of the following two things: One, the defendant possessed a prohibited weapon; and, two, the defendant acted knowingly.

## V. REASONABLE DOUBT INSTRUCTION

¶ 36 In *State v. Portillo*, 182 Ariz. 592, 596, 898 P.2d 970, 974 (1995), our supreme court prescribed a reasonable doubt instruction for future usage in the Arizona courts. When the trial court gave that instruction in this case, Defendant did not object. Defendant has accordingly waived objection on appeal except to fundamental error. Ariz. R.Crim. P. 21.3(c). Defendant does claim on appeal that the *Portillo* instruction amounts to fundamental error because it lessens the State's burden of proof. As the supreme court has mandated the instruction, this argument must be directed to that court.

## VI. MOTION FOR MISTRIAL

¶ 37 Defendant moved in limine before trial to preclude evidence of a shooting that initially led police to search his residence. The court granted the motion. An officer who searched Defendant's residence testified on direct examination that he was assigned to the State Gang Task Force. Defense counsel's objection was sustained. The officer later testified that when he went to Defendant's residence, he had on his "gang squad" uniform. Defendant moved for a mistrial on the ground that these implications of gang affiliation were improper and highly prejudicial. The court found the references improper but denied a mistrial. Instead, the court instructed the jury as follows:

> Ladies and gentlemen, while we were at recess, the attorneys and I spoke about a matter that we agreed that I would provide you with an explanation, and that is when Detective Scadden was on the stand—that was the first detective who testified—there were a number of references made to his being on the Gang Unit or Gang Task Force and the amount of training he had with gangs. And what I want you to know about is that it's irrelevant to this case.

> . . . .

> "Knowingly" means that a defendant acted with awareness of or belief in the existence of conduct or circumstances constituting an offense. It does not mean that a defendant must have known the conduct was forbidden by law.

Mr. Young was not being investigated for being in a gang. He hasn't been accused of being in [or] part of a gang. So this inference that there may have been some gang involved in this case is not one that you can draw. This is not a gang case. And for that matter, the crime that they were investigating when they went over there is irrelevant to this case also. This case is based on the facts that you've heard so far. There should be no negative inferences drawn from any of that other testimony.

Defendant's trial counsel indicated that he agreed with this statement. Defendant's appellate counsel argues, however, that the trial court erred in denying the motion for mistrial. We disagree.

¶ 38  Whether to grant a mistrial is left to the sound discretion of the trial court. *See State v. Armstrong,* 176 Ariz. 470, 474, 862 P.2d 230, 234 (App.1993). "Declaring a mistrial is an unusual remedy for trial error and should not be resorted to unless justice requires such a result." *State v. White,* 160 Ariz. 24, 33, 770 P.2d 328, 337 (1989). Here, the trial court gave a consummately clear and pointed admonition to the jury to disregard the evidence, and we defer to the trial court's judgment that its admonition sufficed and that a mistrial was not required. *See State v. Simms,* 176 Ariz. 538, 541, 863 P.2d 257, 260 (App.1993).

¶ 39  We have reviewed the issues raised by Defendant. Finding no reversible error and sufficient evidence to support conviction, we affirm.

GARBARINO and VOSS, JJ., concur.