128 Cal.Rptr.2d 917 (2002)
104 Cal.App.4th 1365
The PEOPLE, Plaintiff and Respondent,
v.
Lisa Robin McCALL, Defendant and Appellant.
No. C038946.
Court of Appeal, Third District.
December 31, 2002.
Review Granted March 26, 2003.
*920 Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Jo Graves, Senior Assistant Attorney General, J. Robert Jibson, Supervising Deputy Attorney General, Judy Kaida, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication.
BLEASE, Acting Presiding Judge.
Defendant Lisa Robin McCall was convicted by jury of manufacturing methamphetamine (Health & Saf.Code, § 11379.6, subd. (a))[1], possession of ephedrine with intent to manufacture methamphetamine (§ 11383, subd. (c)(1)), possession of hydriodic acid with intent to manufacture methamphetamine (§ 11383, subds.(c)(2) and (f)), and use and possession of methamphetamine. (§§ 11550 and 11377.)[2]
She was sentenced to serve a total of six years in prison on concurrent terms as follows: five years on count one, six years on count two, four years on count three, and two years on count four. Execution of the sentence was suspended pursuant to section 3051, upon a finding defendant is in imminent danger of becoming addicted to narcotics. She appeals from the judgment of conviction.
On appeal, McCall challenges the denial of her motion to suppress evidence seized from her residence and raises several instructional and evidentiary errors.
We agree with her claim that count three must be reversed because the jury was instructed with an unconstitutional mandatory presumption which required it to find defendant possessed hydriodic acid if it found she possessed the essential chemicals red phosphorous and iodine.[3] We will reverse the conviction on count three and affirm the judgment in all other respects.

FACTUAL BACKGROUND

A. The Prosecution's Case
On the afternoon of January 4, 2001, law enforcement officers from the Trinity County Sheriffs Department went to defendant's cabin at Mills Camp in Peanut to arrest her. Officers contacted James Youngman, co-defendant Barry Youngman's father. He told them that defendant was not home. The officers asked if they could go inside the house and look and he said "sure." Upon entry, the officers *921 detected a strong chemical odor coming from the kitchen. When they went into the kitchen, officers saw a glass pan containing a line of a white powdery substance. A glass pipe used to smoke methamphetamine and a piece of paper containing an unidentified substance was found in a back room. The house is an 800 square foot cabin with two bedrooms, a living room, kitchen and laundry room.
Law enforcement officers obtained a search warrant of defendant's residence and returned to execute it later that same day. When the officers were approximately 30 feet from the residence, they smelled a chemical odor. Inside the house, officers observed male and female adult clothing, various receipts and other documents bearing the names of defendant and Barry Youngman, and one bed. In the kitchen there was a full complement of cooking and eating utensils. It appeared that two people resided in the house.
Officers seized four firearms, a glass methamphetamine smoking pipe containing residue, and a hypodermic syringe, a piece of drinking straw with residue buildup consisting of .03 grams of methamphetamine, and a small brown rock determined to be .02 grams of methamphetamine.[4] Also seized were numerous empty baggies of varying sizes commonly used to package illegal narcotics, boxes of ephedrine tablets and sinus medication containing pseudoephedrine, containers of solvent, coffee filters stained with a reddish-colored substance, a can containing baggies with a reddish powdered substance, a digital scale, duct tape, a tetracycline prescription bottle containing beads and a lid with a yellow stain, a small electric coffee grinder containing a white powdery residue, rubber tubing, two bottles labeled red devil lye, a small measuring cup, and a piece of paper bearing an address for the Alpha Iodine Company with prices for various amounts. The majority of the seized items were found either in the utility room or the kitchen.
A blue pickup truck was parked outside at defendant's residence. During a search of the truck on January 4th, officers seized from its interior, a rifle, a letter addressed to defendant, and Sudafed tablets containing pseudoephedrine.
On the morning of January 6th, defendant was arrested as she entered the pickup truck in the parking lot of the Burger King in Weaverville. At that time, sheriffs deputies found located on the seat of the truck, a key for room number 6 at the Indian Creek Motel in Douglas City. The deputies went to room number 6 at the Indian Creek Motel. The room was registered to Barry Youngman. Barry was in the room at the time and was immediately arrested. During a search of the motel room, deputies seized a canvas bag containing defendant's California identification card and a small piece of tinfoil containing an off-white powdery substance later identified as .02 grams of methamphetamine.
Subsequent testing of the powdery substances and the liquids seized from defendant's residence revealed the presence of methamphetamine; ephedrine, a precursor to methamphetamine; phenyl-2-propanone (P-2-P), a by-product in the manufacturing of methamphetamine by the ephedrine-hydriodic acid method; red phosphorus containing methamphetamine and other by-products from the manufacture of methamphetamine by the ephedrine-hydriodic acid method; red phosphorus; *922 and iodine crystals, mixed with water and red phosphorus.
Defendant's latent fingerprints were found on a can of Naptha solvent, and 11 of Barry Youngman's latent fingerprints were found on various items, including jars, bottles, flasks, a dish containing residue, and a coffee grinder, all used in the manufacture of methamphetamine. Defendant and Barry and James Youngman all tested positive for methamphetamine upon their arrests.
Expert testimony established that pseudoephedrine is the only precursor of the ephedrine-hydriodic acid method of processing methamphetamine. A precursor is a primary chemical that is changed into a finished product. Substances used in the manufacture of methamphetamine by the ephedrine-hydriodic acid method include pseudoephedrine tablets, solvents, bases such as Red Devil lye, red phosphorus, and iodine; equipment used to manufacture methamphetamine by that same method include coffee filters, plastic baggies, coffee grinders, funnels, separators, pans, containers, and jars.
An expert opined there was a laboratory to manufacture methamphetamine by the ephedrine-hydriodic acid method in defendant's residence, and that there was a sufficient quantity of pseudoephedrine, red phosphorus, and iodine present to manufacture methamphetamine.

B. The Defense
Defendant did not testify but called Barry Youngman, who testified he was convicted of manufacturing methamphetamine based upon the same facts presented in the instant case. He lived with defendant from June 2000 to January 2001 and manufactured methamphetamine at her residence in January of 2001. However, he never showed defendant the manufacturing operation, and attempted to "keep it a secret from her" by hiding materials and laboratory equipment "off the premises" in a travel trailer and a van that he kept on her property.
Barry admitted both he and defendant were at her residence on January 3rd and the morning of January 4th, but he claimed he did not manufacture methamphetamine on January 4th until defendant left her residence at approximately 1 p.m. to go to court. When Barry saw law enforcement officers arrive at the residence, he fled, leaving his father at the residence. Barry owned three of the four firearms found in defendant's residence but never showed them to her. He tested positive for methamphetamine on January 6th and gave defendant that drug on that same day. During the time he lived with defendant, he manufactured methamphetamine for the two of them to ingest and defendant knew where he obtained the drug.

DISCUSSION

I[*]

II

Mandatory Presumption on Count Three[8]
Defendant contends section 11383, subdivision (f) and the corresponding CALJIC instructions "create an impermissible mandatory presumption that possession of iodine and red phosphorus is sufficient to prove possession of hydriodic acid." Respondent contends that subdivision (f) is *923 not an unconstitutional mandatory presumption "because the predicate facts that a defendant possessed essential chemicals (i.e., iodine and red phosphorus) sufficient to manufacture hydriodic acid, with the intent to manufacture methamphetamine, necessarily prove that a defendant possessed hydriodic acid."
Defendant was charged in count three with possessing hydriodic acid with intent to manufacture methamphetamine in violation of section 11383, subdivisions (c)(2) and (f).[9]
Subdivision (f) of section 11383 provides in pertinent part:
"possession of immediate precursors sufficient for the manufacture of ... hydriodic acid ... shall be deemed to be possession of the derivative substance. Additionally, possession of essential chemicals sufficient to manufacture hydriodic acid, with intent to manufacture methamphetamine, shall be deemed to be possession of hydriodic acid."
Pursuant to subdivision (f), the jury was instructed in pertinent part as follows:
"The defendant is charged in count three of having violated section 11383(c)(1) [sic] of the Health and Safety Code, which is a crime.
"Every person who, with the intent to manufacture methamphetamine or any of its analogs, namely hydriodic acid, possesses any salts, isomers, or salts of isomers of ephedrine or pseudoephedrine or possesses at the same time any of the following, a combination product thereof, namely red phosphorous and iodine, is guilty of a violation of Health and Safety Code section 11383(c)(1) [sic], a crime.
"In order to prove this crime, each of the following elements must be proved: [¶] A person possessed ... red phosphorus and iodine; and [¶] that person had the specific intent to manufacture methamphetamine .... For the purpose of this section, possession of immediate precursors is sufficient for the manufacture of hydriodic acid with the intent to manufacture methamphetamine, shall be deemed to be in possession of hydriodic acid."
In essence then, the jury was instructed that it must find defendant possessed hydriodic acid if it found she possessed the precursors of hydriodic acid, namely, red phosphorus and iodine.
Mandatory presumptions in criminal statutes may be unconstitutional if they relieve the prosecution from having to prove each element of the offense beyond a reasonable doubt. (People v. Roder (1983) 33 Cal.3d 491, 496-498, 189 Cal. Rptr. 501, 658 P.2d 1302; Sandstrom v. Montana (1979) 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39, 48.) A mandatory presumption is one that tells the trier of fact that it must assume the existence of the elemental fact from proof of the basic fact. (People v. Roder, supra, at p. 498, 189 Cal.Rptr. 501, 658 P.2d 1302; Ulster County Court v. Allen (1979) 442 U.S. 140, 158, 99 S.Ct. 2213, 2226, 60 L.Ed.2d 777, 792.) The prosecution may not rely on a mandatory presumption unless it is accurate. There must be a "rational connection" between the basic fact proved and the ultimate fact presumed (Ulster County Court v. Allen, supra, at p. 165, 99 S.Ct. at p. 2228, at p. 797) and "the fact proved is sufficient to support the inference of guilt beyond a reasonable doubt." (Id. at p. 167, 99 S.Ct. at p. 2230, 60 L.Ed.2d at p. *924 798; Sandstrom v. Montana, supra, 442 U.S. at pp. 521-524, 99 S.Ct. at pp. 2458-2459, 61 L.Ed.2d at pp. 49-51.)
Subdivision (f) specifies that a finding of the basic fact that the defendant possessed the immediate precursors or the essential chemicals (red phosphorous or iodine) sufficient to manufacture hydriodic acid, is deemed a finding of the ultimate fact of possession of hydriodic acid. Because the jury is not free to reject the inference of the presumed fact once it finds the proved facts, the statute and the instruction constitute mandatory presumptions.
A mandatory presumption may be constitutional if it is accurate beyond a reasonable doubt. (Sandstrom v. Montana, supra, 442 U.S. at pp. 521-524, 99 S.Ct. at pp. 2458-2459, 61 L.Ed.2d at pp. 49-51.) Here, neither the statutory presumption nor the instruction based upon the statute are accurate. They both equate possession of the essential chemicals with possession of the synthesized substance. They are not the same.
Expert testimony established that hydriodic acid is a controlled substance that is difficult to purchase so methamphetamine manufacturers generally make their own. They do this by combining iodine, red phosphorus, and water and heating the three chemicals together. Therefore, while there is a rational basis to conclude that red phosphorus and iodine are the essential chemicals of hydriodic acid, there is no rational basis to conclude that those two essential chemicals constitute hydriodic acid. The latter substance is a different substance which does not come into existence until it is synthesized from its essential components under a process of heat. At that point, the iodine is converted to hydriodic acid while the red phosphorous retains its original properties as red phosphorous. We therefore conclude the presumption is unconstitutional.
Nor was the instructional error harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; Rose v. Clark (1986) 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460.) "The issue under Chapman is whether the jury actually rested its verdict on evidence establishing the presumed fact beyond a reasonable doubt, independently of the presumption." (Yates v. Evatt (1991) 500 U.S. 391, 404-405, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432, 449, overruled on other grounds in Estelle v. McGuire (1991) 502 U.S. 62, 72, fn. 4, 112 S.Ct. 475, 482, fn. 4, 116 L.Ed.2d 385, 399.)
In this case, the answer to that question is perfectly clear because there is absolutely no evidentiary support for a finding of the presumed fact of possession of hydriodic acid. The prosecution conceded no hydriodic acid was found in defendant's residence. In order to establish the presumed fact, the prosecutor relied on the unconstitutional presumption, arguing there was "red phosphorous and iodine, and these two things, in combination make hydriodic acid." Accordingly, because there was no evidence upon which the jury could have found defendant was in possession of hydriodic acid, we hold the error was not harmless.

III-IV[**]

V

Admission of Drug Test Results
Defendant contends the trial court erroneously admitted evidence that she, Barry Youngman (Barry), and James Youngman (James) tested positive for methamphetamine, *925 that methamphetamine was seized from James upon his arrest, that defendant and Barry met while they were in a drug rehabilitation program, that defendant and Barry consistently used methamphetamine between June 2000 and January 2001, and that defendant was not employed. She argues this evidence is essentially evidence of prior bad acts which is inadmissible under Evidence Code section 1101, subdivision (a). Respondent contends the evidence was properly admitted to prove defendant's knowledge of the narcotic character of methamphetamine. We find the evidence was properly admitted.
During in limine motions, the court admitted evidence that upon their arrests, defendant, Barry, and James tested positive for methamphetamine. The prosecution argued that evidence of defendant's test results and use of methamphetamine was relevant to show her knowledge of the narcotic character of the methamphetamine. The court found the test results and possession by defendant and her two co-defendants were relevant to show "the relationship of the three individuals in the processing of and possession and use of methamphetamine."
During trial and over objection by defense counsel, the court admitted a plastic bag containing a white powdery substance found in James' pocket by jail personnel upon his arrest on January 10th.[19] It was offered to show the connection between the defendant, Barry, and James. Trinity County Sheriffs Deputy Bruce Haney identified the plastic bag as an item seized from James' wallet upon his arrest. The content of the bag was not identified.
Barry testified on cross-examination that he met defendant at an in-patient treatment program in 1998 and that the two of them consistently used methamphetamine between June 2000 and January 2001. Defense counsel objected to this testimony on the grounds it exceeded the scope of direct examination and violated Barry's Fifth Amendment rights. Barry also testified, without objection, that defendant was not employed.
On appeal, a trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. (People v. Waidla (2000) 22 Cal.4th 690, 717-718, 94 Cal.Rptr.2d 396, 996 P.2d 46; People v. Williams (1997) 16 Cal.4th 153, 197, 66 Cal.Rptr.2d 123, 940 P.2d 710.) We will find error only where the trial court's decision exceeded the bounds of reason. (People v. Furies (1994) 23 Cal.App.4th 1506, 1519, 28 Cal.Rptr.2d 758.) Moreover, we review the trial court's ruling, not its reasoning. (People v. Mason (1991) 52 Cal.3d 909, 944, 277 Cal.Rptr. 166, 802 P.2d 950.)
Only relevant evidence is admissible. (Evid.Code, § 350.) "`Relevant evidence' means evidence, including evidence relevant to the credibility of a witness ..., having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid.Code, § 210.) While evidence of a person's character or trait of character is inadmissible to prove the person's conduct on a specified occasion (Evid.Code, § 1101, *926 subd. (a)), evidence of wrongdoing is admissible when relevant to prove motive, plan, or knowledge. (Evid.Code, § 1101, subd. (b); People v. Pijal (1973) 33 Cal. App.3d 682, 691, 109 Cal.Rptr; 230 [prior narcotic offenses admissible to prove knowledge and intent in prosecution for furnishing and selling dangerous drug]; People v. Conrad (1973) 31 Cal.App.3d 308, 326, 107 Cal.Rptr. 421 [evidence that defendant is a narcotic addict admissible to show motive to sell drugs and steal]; People v. Thornton (2000) 85 Cal.App.4th 44, 49-50, 101 Cal.Rptr.2d 825 [use of heroin admissible to show knowledge of its narcotic character].)
Defendant was charged in count four with possessing for sale, a controlled substance, to wit, methamphetamine. (§ 11378.) "Unlawful possession of a controlled substance for sale requires proof the defendant possessed the contraband with the intent of selling it and with knowledge of both its presence and [its] illegal character." (People v. Meza (1995) 38 Cal. App.4th 1741, 1745-1746, 45 Cal.Rptr.2d 844; People v. Harris (2000) 83 Cal. App.4th 371, 374, 99 Cal.Rptr.2d 618.)
Thus, the narcotics-related evidence, namely defendant's drug test results and her consistent use of methamphetamine for the six months prior to her arrest, was admissible to establish her knowledge of its narcotic character. (People v. Thornton, supra, 85 Cal.App.4th at pp. 49-50, 101 Cal.Rptr.2d 825.)
The other narcotic related evidence, including the test results for Barry and James, the evidence that defendant and Barry met in a rehabilitation facility, that she and defendant consistently used methamphetamine, and that defendant was unemployed, was relevant to establish the motive of the three co-conspirators to engage in a conspiracy to manufacture methamphetamine o satisfy their common drug habits. (People v. Guyette (1964) 231 Cal. App.2d 460, 467, 41 Cal.Rptr. 875.) Defendant's and Barry's stay in a drug rehabilitation facility followed by their continued and consistent drug use, established the nature of their relationship, the extent of their addiction and the resulting strength of their motive to secure methamphetamine for their combined use. Defendant's unemployed status was relevant to establish her need to join the conspiracy so that she could satisfy her addiction despite the fact she had no lawful income to support her habit. There was no abuse of discretion in admitting this evidence.
However, the probative value of the plastic baggie seized from James's wallet was minimal because there was no testimony identifying the white powdery residue in the bag. Nevertheless, admission of the baggie was harmless in light of the evidence James tested positive for methamphetamine upon his arrest, and Barry's testimony that he "felt remorse for making [defendant] an addict," that he manufactured the methamphetamine mostly for himself and defendant, and that between June 2000 and January 2001, defendant knew where Barry got the methamphetamine. (People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243.) Accordingly, we reject defendant's claims of prejudicial error.

DISPOSITION
The judgment of conviction on count three is reversed. The judgment is affirmed in all other respects.
We concur: DAVIS and MORRISON, JJ.
NOTES
[1] All further section references are to the Health and Safety Code unless otherwise indicated.
[2] Defendant was charged jointly with Barry Youngman.
[3] The Reporter of Decisions is directed to publish the opinion except for Parts I and III through IV of the Discussion.
[4] Expert testimony established that .02 and .03 grams of methamphetamine are usable amounts.
[*] See footnote 3, ante.
[8] Defendant raises several additional instructional errors relating to count three. Because we find the jury was given an unconstitutional mandatory presumption requiring reversal of count three, we do not address defendant's other instructional claims relating to that count.
[9] Section 11383, subdivision (c)(2) provides: "Any person who, with intent to manufacture methamphetamine or any of its analogs specified in subdivision (d) of Section 11055, possesses hydriodic acid or any product containing hydriodic acid is guilty of a felony...."
[**] See footnote 3, ante.
[19] Without providing a record citation, defendant contends the evidence admitted was a piece of methamphetamine found in James' pocket, while respondent contends that exhibit was a plastic bag. The record is unclear. The evidence in question was identified and introduced as Exhibit 34. The index in the Reporter's Transcript describes Exhibit 34 as a plastic bag with a white powdery substance, while the trial court described it as "the methamphetamine" found in James' pocket. We have conducted our own inquiry and are satisfied the index of the Reporter's Transcript properly describes Exhibit 34 as a plastic baggie with a white powdery substance.