**In the Matter of the WELFARE OF A.A.E., Child.**

**No. C6–97–1727.**

Supreme Court of Minnesota.

April 1, 1999.

John M. Stuart, State Public Defender, Charlann Winking, Assistant State Public Defender, Minneapolis, for appellant.

Alan L. Mitchell, St. Louis County Attorney, Duluth, Mark M. Starr, Assistant County Attorney, Virginia, for respondent.

## OPINION

STRINGER, J.

While deer hunting in St. Louis County appellant A.A.E. intentionally discharged a firearm several times in the direction of a noise he heard and movement he perceived, but tragically what he thought was a deer was in fact a deer stand occupied by 16–year–old Danelle Pogorels. Two shots struck Pogorels causing serious injury. Appellant was charged by petition with the intentional discharge of a firearm under circumstances that endanger the safety of another in violation of Minn.Stat. § 609.66, subd. 1a(a)(2) (1998). Appellant essentially argued that the statute required proof of intent both as to the discharge of the firearm and as to the endangerment of another person. The district court applied a strict liability standard and concluded that guilt was established on proof of the intentional discharge of a firearm under circumstances that endangered another, irrespective of appellant's knowledge that he was endangering another person when the gun was discharged. The court of appeals affirmed the district court. We affirm but on different grounds.

On Friday evening, November 15, 1996, appellant, then 16–years–old, arrived at a hunting trailer located in Greaney, Minnesota for a weekend of deer hunting with some family members. He had been an avid hunter for eight years, had used a rifle for the past four years, and had successfully completed a mandatory firearm safety class. He was aware of the primary rules of firearm safety including ascertaining the identity of a target before shooting and not shooting at flashes of color, sounds, or shapes in trees.

Appellant left the hunting trailer sometime after 7:00 a.m. on the overcast morning of November 16. The plan was for appellant to go to a duck blind and wait for his uncle to drive the deer toward him. Appellant had only been hunting in the area one time before and took the wrong trail. He hiked to the top of a ridge and saw a deer stand above him, approximately 12 feet high, among some trees. He had never been to this particular area before and realizing that he was lost, he climbed the stand.

Appellant testified that after about 10 minutes he heard a crack and saw what he thought was a "brown spot" in the distance. He then saw a movement and what he thought were antlers, so he was convinced it was a deer. He looked through his scope before taking his first shot and did not see anything orange indicating the presence of another hunter, nor did he see any man-made objects. He waited a few moments then aimed and fired his first shot above where he thought the deer was located in order to scare it into a better position. He waited about 15 or 20 seconds and then shot three more times in 3 to 5 second increments at what he thought was movement.

Appellant heard screams after he fired his fourth shot. He climbed down from the deer stand and ran in the direction of the screams. Then, for the first time, he saw that there was a second deer stand. He climbed the ladder of the second stand and found Pogorels with her knee covered in blood. Appellant realized that what he mistakenly believed was a deer was in fact a second deer stand and that what he had shot was Pogorels.

Pogorels and some members of her family had arrived the night before at her grandfather's property to go hunting the next morning. The plan was for her to go to one of the deer stands that her family had constructed. Pogorels, dressed in blaze orange clothing, climbed into her stand and waited. About 10 minutes later she noticed a person in the second stand and assumed that it was her uncle because it was his stand. After approximately another 10 minutes, she heard the sound of a gun from the second stand. Pogorels looked around but could not see a deer, nor did she hear any deer noises. She heard a second shot and immediately felt something near her hip. She stood up and looked toward the second stand and looked again for a deer. As she started to sit back down again she heard a third shot, felt a severe pain in her left knee and began screaming. She testified that she heard one more shot from the second stand and then she saw appellant.

Appellant was charged with discharge of a firearm in violation of Minn.Stat. § 609.66, subd. 1a(a)(2):

(a) Whoever does any of the following is guilty of a felony and may be sentenced as provided in paragraph (b): * * *

(2) intentionally discharges a firearm under circumstances that endanger the safety of another * * *.[1]

The criminal code provides the following definition of "intentionally":

the actor either has a purpose to do the thing or cause the result specified or believes that act performed by the actor, if successful, will cause that result. In addition, * * * the actor must have knowledge of those facts which are necessary to make the actor's conduct criminal and which are set forth after the word "intentionally." [2]

At trial, a deputy sheriff described the brown spot that the appellant shot at as "a man-made structure" that is visible to the naked eye from the stand appellant occupied. He further testified that on January 3, 1997, using the scope on appellant's rifle, the brown spot appellant testified was his target could be recognized as a man-made structure. The distance between the two deer stands was estimated to be about 90 yards, approximately the length of a football field. There was considerable testimony as to what appellant told various witnesses he was shooting at and exactly what he could see from the deer stand, and while the evidence clearly indicates that appellant did not know he was shooting at a person, it is equally clear that in fact he was not shooting at a deer.

1. Minn.Stat. § 609.66, subd. 1a(a)(2) (1998).

2. Minn.Stat. § 609.02, subd. 9(1)(3) (1998).

The district court found that the appellant intentionally discharged his firearm several times in the direction of what he thought was a deer under circumstances that endangered the safety of Pogorels. The court rejected appellant's argument that he should be found not guilty of violating Minn.Stat. § 609.66, subd. 1a(a)(2) because of the accidental nature of the occurrence. The court held that even though appellant had unintentionally shot Pogorels, there was nothing in the legislative history to indicate that mistake of fact was a defense. Therefore the court concluded that he was guilty of intentionally discharging a firearm under circumstances that endangered the safety of another person in violation of Minn.Stat. § 609.66, subd. 1a(a)(2).

The court of appeals affirmed the district court rejecting appellant's argument that "specific intent to endanger the safety of another" must be proven by the state before felony criminal liability would attach under Minn.Stat. § 609.66, subd. 1a(a)(2). The court held that the specific intent requirement applied solely to the discharge of a firearm and that the clause "endanger the safety of another" refers to the "attendant circumstance[s] that must be present while intentionally discharging a firearm." [3] Specifically, the court held that "[appellant's] disregard for what he was firing at created a danger to others that falls within the conduct prohibited by the statute." [4]

■ Statutory construction is reviewed under a de novo standard.[5]

It is not disputed that while deer hunting in unfamiliar territory appellant intentionally discharged a firearm at what he believed was a deer, based on his observations of a "brown spot" and noise or movement in the woods. Nor is it disputed that what he shot at was not a deer—it was a person.

Appellant contends that both the district court and the court of appeals erred in not including proof of knowledge or awareness of

the particular "circumstances that endanger[ed] the safety of another" when he intentionally discharged the firearm before felony criminal liability could attach. Appellant further argues that the definition of "intent" was incorrectly applied; that the definition plainly provides that the word "intentionally" must be read to modify not only the verb "discharges," but also the circumstances under which the discharge occurred. Put another way, appellant asserts that Minn.Stat. § 609.66, subd. 1a(a)(2) is a specific intent crime and that before criminal felony liability could attach the state must prove beyond a reasonable doubt that appellant intentionally discharged the firearm despite having knowledge that doing so would be likely to endanger the safety of another person.

The state responds, relying principally on the plain language of the statute and grammatical rules of construction, that knowledge or fault is not required to find a violation of the statute because the word "intentionally" does not modify any of the words contained in the phrase "under circumstances that endanger the safety of another." The state asserts that the only element of the statute that requires specific intent is discharging the firearm and if someone is injured by the intentional discharge of a firearm, application of the statute is triggered. Under the state's analysis it is clear that the accused must only intend to discharge the firearm and the result dictates whether the circumstances were such that a person's safety was endangered.

The placement of "intentionally" in subdivision 1a(a)(2)—"intentionally discharges a firearm * * *"—is a strong indication that the only intent required by the legislature is the intent to discharge a firearm. If the legislature had intended the crime to include purposeful endangerment of another person it would have added language such as "*with intent* to endanger the safety of another person*," statutory language commonly used to indicate that proof of specific intent to cause harm to another is necessary before criminal liability will attach.[6] Further, to

3. *In re A.A.E.*, 579 N.W.2d 149, 152 (Minn.App. 1998).

4. *Id.*

5. *See Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985).

6. *See, e.g.,* Minn.Stat. § 609.19, subd. 1(1) (1998) (stating that a person is guilty of second-degree murder if an actor "causes the death of a human being *with intent* to effect the death of that person or another") (emphasis added).

hold that the term "intentionally" requires both the intent to discharge a firearm *and* knowledge that doing so will endanger another person not only rewards those who willfully or negligently remain ignorant—it renders the statute superfluous because appellant could have been charged under other criminal statutes requiring the same elements of proof.[7]

We agree with the state that the legislature may forbid the doing of an act and declare its commission a crime even in the absence of a specific intent to cause the particular result.[8] We are not prepared to hold however, that with respect to section 609.66, subd. 1a(a)2, criminal liability arises in *every instance* where a firearm is intentionally discharged and through a series of events the safety of another is endangered. To do so would eviscerate the qualifying terms "under circumstances" and could lead to a totally absurd result.[9] We do not believe the legislature intended such an undisciplined application of the statute. We conclude that the plain meaning of "under circumstances" directs the court's inquiry into whether, under the totality of the circumstances extant at the moment the trigger was pulled—including what the defendant knew and particularly important here, what the defendant did not know— would the discharge of the firearm place another person's safety in danger.

While we decline to define the outer boundaries of what those "circumstances" might be, we do not hesitate to conclude that under these circumstances appellant's conduct fell well within the appropriate reach of the statute. It is undisputed that appellant intended to fire the gun at either a noise or a movement and that he fired his gun four times without knowing the identity of his target. The evidence also supports the conclusion that he fired the gun even after the victim, only 90–yards away, stood up to a position that her blaze orange clothing should have been visible to him. Clearly these are circumstances of endangerment, and whether known or unknown to him, when coupled with appellant's intent to discharge the firearm, the evidence was sufficient beyond a reasonable doubt to prove that appellant "intentionally discharged a firearm under circumstances that endangered another person" in violation of Minn.Stat. § 609.66, subd. 1a(a)(2).

Affirmed.

---

7. If the state could prove that appellant intentionally discharged a firearm despite knowledge that doing so would endanger Pogorel's life, appellant would likely have been charged with attempted murder in violation of Minn.Stat. §§ 609.185 (1998); 609.17 (1998) or assault with a dangerous weapon in violation of Minn.Stat. § 609.222, subd. 2 (1998).

8. *See, e.g.,* Minn.Stat. § 609.205, subd. 2 (1998) (stating that a person is guilty of manslaughter in the second degree if he or she "shoot[s] [and kills] another * * * as a result of negligently

believing the other to be a deer or other animal").

9. "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (1998); *see also* Minn.Stat. § 645.17(1) (1998) (stating that statutes cannot be construed to produce an absurd. result); *Park Towers Ltd. Partnership v. County of Hennepin,* 498 N.W.2d 450, 454 (Minn.1993) (rejecting statutory construction that would yield absurd results).