STATE of Minnesota, Respondent,

v.

**John ARKELL, Appellant,**

**Carriage Homes, Inc., Defendant.**

**No. C1–02–856.**

Court of Appeals of Minnesota.

March 14, 2003.

Mike Hatch, Attorney General, St. Paul, and Lee A. Bjorndal, Baudler, Baudler, Maus & Blahnik, LLP, Austin, for respondent.

Richard A. Beens, Eric J. Riensche, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, for appellant.

Considered and decided by
PETERSON, Presiding Judge,
RANDALL, Judge, and WILLIS, Judge.

## OPINION

WILLIS, J.

John Arkell seeks reversal of his conviction of violating the State Building Code.

He argues that the district court erred by (1) determining that Minn.Stat. § 16B.69 (2000) is a public-welfare statute; (2) concluding that Minn.Stat. § 16B.69 imposes strict liability; and (3) applying the responsible-corporate-officer doctrine. Because we find no error, we affirm.

## FACTS

Carriage Homes, Inc. was a general contractor and Minnesota corporation engaged in multi-family residential and land-development projects. At all relevant times, appellant John Arkell was Carriage Homes' chief executive officer, president, and sole shareholder.

In 1997, the Austin City Council approved Carriage Homes' development plan for Southwinds, a condominium development of 38 residential units. Carriage Homes engaged subcontractors to perform the labor to construct the development, but it directly employed project managers to handle day-to-day operations and to supervise the subcontractors. The development was substantially completed in 1998.

The foundation elevations of some of the Southwinds units were lower than permitted under the State Building Code, causing storm water to pool in the units' driveways and garages. Austin's Development Director sent Arkell a series of seven letters in 1999 and 2001 concerning the elevation problems, and Arkell gave the letters to the project managers, who failed to resolve the problems.

The City of Austin has incorporated the State Building Code [1] into its ordinances, Austin, Minn., City Code § 4.01 (1999), and Minn.Stat. § 16B.69 (2000) makes a violation of the State Building Code a mis-

1. The Uniform Building Code, as promulgat-　　　ed by the International Conference of Build-

demeanor. On May 30, 2001, the state charged Carriage Homes and Arkell with three misdemeanor counts each, alleging a violation of the Uniform Building Code (UBC) and thereby both an ordinance violation and a violation of Minn.Stat. § 16B.69.

The district court dismissed two of the counts against both Carriage Homes and Arkell. On the remaining count, a charge of violating UBC § 1806.5.5 (1997) by providing the units with inadequate foundation elevations, Carriage Homes pleaded guilty and was sentenced to a $1,000 fine. But Arkell pleaded not guilty, asserting that he could not be held criminally responsible for the violation. After a bench trial, the district court found Arkell guilty under the responsible-corporate-officer doctrine of violating UBC § 1806.5.5 and thereby Minn.Stat. § 16B.69. He was sentenced to pay a fine, to pay restitution to the condominium owners, and to serve 90 days in jail, with 80 days stayed pending his compliance with sentencing conditions. This appeal follows.

### ISSUES

1. Did the district court err by determining that Minn.Stat. § 16B.69 (2000) is a public-welfare statute?

2. Did the district court err by determining that Minn.Stat. § 16B.69 is a strict-liability statute?

3. Did the district court err by applying the responsible-corporate-officer doctrine?

### ANALYSIS

### I.

■ Determination of whether Minn. Stat. § 16B.69 (2000) is a public-welfare statute is necessary to our analyses both of whether the statute imposes strict liability and of application of the responsible-corporate-officer doctrine. We therefore address that issue first.

■ The district court determined that section 16B.69 is a public-welfare statute because the building code is intended to protect the health, safety, and welfare of the citizens of this state. Arkell argues that section 16B.69 is not a public-welfare statute because the State Building Code does not regulate conduct that is "crucial to the public health." A district court's decision on a question of law is subject to de novo review. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

■ A public-welfare statute regulates conduct that is potentially harmful or injurious. *In re C.R.M.,* 611 N.W.2d 802, 806 (Minn.2000); *Staples v. United States,* 511 U.S. 600, 607, 114 S.Ct. 1793, 1798, 128 L.Ed.2d 608 (1994) (characterizing public-welfare statutes as regulating dangerous conduct, devices, products, or materials). Public-welfare statutes "pervasively affect activities which threaten human health and safety as well as the environment." *In re Dougherty,* 482 N.W.2d 485, 489 (Minn. App.1992) (citation omitted), *review denied* (Minn. June 10, 1992). Examples of such statutes include laws designed to regulate narcotics, *see United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), to prevent the adulteration of foods and drugs, *see United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and to control hazardous waste, *United States v. Int'l Minerals & Chem.*

ing Officials, is incorporated into and made part of the Minnesota State Building Code, except as modified by the provisions of chapter 1300, part 1305.0200 of Minnesota Rules. Minn. R. § 1305.0010 (2001). None of the state modifications applies here.

*Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); *Dougherty*, 482 N.W.2d at 489.

Section 16B.69 regulates activities that pervasively affect human health and safety because the State Building Code protects the public's health, safety, and welfare. *See Dougherty*, 482 N.W.2d at 489 (describing hazardous-waste laws as public-welfare statutes because they control conduct that pervasively threaten human health and safety); *see also* Minn.Stat. § 16B.59 (2000) (stating that State Building Code's purpose is to "establish reasonable safeguards for health, safety, welfare, comfort, and security of the residents of this state"); UBC § 101.2 (1997) ("The purpose of this code is to provide minimum standards to safeguard life or limb, health, property and public welfare"); *City of Minnetonka v. Jones Assoc., Inc.*, 306 Minn. 217, 222, 236 N.W.2d 163, 166–67 (1975) (describing State Building Code's objectives as protecting the public's health and welfare); *cf. State v. Young*, 192 Ariz. 303, 965 P.2d 37, 45 n. 7 (Ct.App.1998) (describing violation of building code as example of public-welfare-statute violation).

Because section 16B.69 enforces the State Building Code, the district court did not err by determining that section 16B.69 is a public-welfare statute.

## II.

■ Arkell argues that because he did not intend to violate the building code, his conviction cannot stand. He contends that section 16B.69 is not a strict-liability statute because "liability cannot attach unless the [state] shows the defendant knowingly or intentionally committed a building code violation." Arkell argues that a mens rea requirement must be implied in section 16B.69 because Minnesota caselaw disfavors strict-liability statutes and because legislative intent to impose strict liability must be clear.

■ The district court determined that section 16B.69 is a strict-liability statute because it does not on its face require culpable intent and because it is a public-welfare statute. We have already concluded that section 16B.69 is a public-welfare statute. Statutory construction is a legal determination, which is reviewed de novo. *In re A.A.E.*, 590 N.W.2d 773, 776 (Minn. 1999). The object of our review is to ascertain and effectuate legislative intent. Minn.Stat. § 645.16 (2002).

■ Although this is a matter of first impression in Minnesota, we note that courts in other jurisdictions have determined that a showing of culpable intent is not necessary to establish a violation of a building code. *See, e.g., State v. Edelman*, 64 Conn.App. 480, 780 A.2d 980, 983 (2001) (concluding that defendant was subject to criminal liability for violation of Connecticut's uniform building code without a showing of culpable intent); *Young*, 965 P.2d at 45 n. 7 (noting that typically no evidence of culpable intent is required to subject defendants to criminal liability for violations of building codes). While courts may read into common-law crimes a mens rea requirement even where the statute does not expressly require it, there is no presumption that public-welfare statutes require proof of mens rea to establish liability. *C.R.M.*, 611 N.W.2d at 806. The rationale is that public-welfare statutes impose liability for the "type of conduct that a reasonable person should know is subject to stringent public regulation and may seriously threaten the community's health or safety." *Id.* (quoting *Liparota v. United*

*States*, 471 U.S. 419, 433, 105 S.Ct. 2084, 2092, 85 L.Ed.2d 434 (1985)); *see also Morissette v. United States*, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952) (noting that public-welfare statutes as matter of policy do not require a showing of culpable intent because accused is usually in position to prevent violation). A violation of a public-welfare statute

> impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same. * * * Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element.

*C.R.M.*, 611 N.W.2d at 806 (alteration in original) (quotation omitted).

 Strict-liability statutes are generally disfavored, but the supreme court has inferred mens rea in statutes that are silent on the subject only when the statutes provide felony or gross-misdemeanor penalties. *See, e.g., id.* at 805, 809; *State v. Neisen*, 415 N.W.2d 326, 329 (Minn.1987); *State v. Strong*, 294 N.W.2d 319, 320 (Minn.1980). The United States Supreme Court in *Staples* stated that "the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea*." 511 U.S. at 616, 114 S.Ct. at 1802. When the punishment imposed is only a light penalty "such as fines or short jail sentences," the Supreme Court has "construed [such] statutes to dispense with *mens rea*." *Id.* at 616, 618, 114 S.Ct. at 1802–03. Because a violation of section 16B.69 is a misdemeanor, the policy disfavoring strict-liability statutes is not implicated.

 Arkell further argues that the rule of lenity requires that a mens rea requirement be inferred in section 16B.69. But the rule of lenity, which requires that ambiguity concerning the scope of a criminal statute should be resolved in favor of the defendant, has no application when a court finds no ambiguity in a statute. *State v. Loge*, 608 N.W.2d 152, 156 (Minn. 2000) (holding that statute silent on mens rea does not require that state prove culpable intent to impose misdemeanor liability on driver of motor vehicle containing open bottle of intoxicating liquor). The language of section 16B.69 is clear and unambiguous: "A violation of the code is a misdemeanor." Because the statute is clear, the rule of lenity does not apply.

We conclude that the legislature intended to impose strict liability for violations of the State Building Code; therefore, the district court did not err by determining that section 16B.69 is a strict-liability statute.

### III.

 Arkell concedes that, under the responsible-corporate-officer doctrine, criminal liability may be imposed on a corporate officer for a corporation's violation of a strict-liability public-welfare statute. But he contends that the district court erred by applying the doctrine here because he had no control over the actions of the subcontractors who actually violated the State Building Code. A district court's decision on a question of law is subject to de novo review. *State v. Modern Recycling, Inc.*, 558 N.W.2d 770, 771–72 (Minn. App.1997) (reviewing de novo district court's application of responsible-corporate-officer doctrine making corporate officer personally liable for administrative penalty against corporation).

 In *United States v. Park*, the United States Supreme Court described

application of the responsible-corporate-officer doctrine to a violation of a public-welfare statute:

> [T]he liability of managerial officers did not depend on their knowledge of, or personal participation in, the act made criminal by the statute. Rather, where the statute under which they were prosecuted dispensed with 'consciousness of wrongdoing,' an omission or failure to act was deemed a sufficient basis for a responsible corporate agent's liability. It was enough in such cases that, by virtue of the relationship he bore to the corporation, the agent had the power to prevent the act complained of.

421 U.S. 658, 670–71, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). Criminal liability under the responsible-corporate-officer doctrine, therefore, does not depend on "the knowledge of, or personal participation in, the act made criminal by the statute." *Id.* at 670, 95 S.Ct. at 1911. It is enough in such cases that the officer had the power to prevent or cure the violation. *Id.* at 671, 95 S.Ct. at 1911; *see Dougherty*, 482 N.W.2d at 490 (explaining that defendant in *Park* was criminally liable under responsible-corporate-officer doctrine because he failed to prevent or correct adulteration of food that constituted violation of federal law).

■ To impose personal criminal liability on a corporate officer under the responsible-corporate-officer doctrine the state must prove, in addition to showing a violation by the corporation of a public-welfare statute, that

> the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill

the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link.

*Park*, 421 U.S. at 673–74, 95 S.Ct. at 1912.

Arkell was Carriage Homes' chief executive officer, president, and sole shareholder; therefore, he controlled the corporation's policies and activities. *See id.; see also Dougherty*, 482 N.W.2d at 490 (describing requirement that corporate officer control corporation's policies and activities if responsible-corporate-officer doctrine is to be applied). Because Carriage Homes was the general contractor for the project, Arkell had a nondelegable duty either to prevent in the first instance or to promptly correct the building-code violation at issue here. *See* UBC § 103 (1997) (defining as illegal the act of person or corporation violating uniform building code in the construction of a building); *see also Brasch v. Wesolowsky*, 272 Minn. 112, 117, 138 N.W.2d 619, 623 (1965) (stating that general contractor had nondelegable duty to owner to use due care in the performance of his undertaking); *Bastian v. Carlton County Highway Dep't*, 555 N.W.2d 312, 316 (Minn.App.1996) (citation omitted) (stating that general contractors have responsibility to ensure that subcontractors comply with OHSA regulations), *review denied* (Minn. Jan. 7, 1997).

Further, there was a causal link between Arkell's position with Carriage Homes and the violation of the State Building Code. *See Park*, 421 U.S. at 674, 95 S.Ct. at 1912; *Dougherty*, 482 N.W.2d at 490 (describing requirement that corporate officer's control relate to corporation's conduct that constituted violation). Starting in 1999, the City of Austin's development director personally informed Arkell in writing on seven occasions that the elevations of the foundations of some units at

Southwinds violated the building code. At the time of trial in 2002, Arkell testified that he received the letters regarding the violation, that he passed the letters on to his subordinates, and that the violation had not been remedied. Furthermore, the district court found that

> [t]he [State Building Code] violation was definitely within [Arkell's] sphere of influence. Although Arkell asserts that he was not involved in the overall construction, he did retain authority to exert influence over those who were in charge of the construction process, as well as hire and fire personnel. Arkell took no corrective action once the inadequate storm drainage violations were brought to his attention.

Based in part on these findings, the district court concluded that Arkell's position in Carriage Homes and his admitted failure to take personal action to correct the building-code violation demonstrated the required causal link. The record supports the court's determination.

In *Park*, which was based on facts analogous to those here, the Supreme Court concluded that a causal link existed between a corporate officer's position and the corporation's violation of a public-welfare statute when the corporate officer (1) was the corporation's president, (2) acknowledged that he received letters from regulators regarding violations and merely passed them on to subordinates, (3) failed to ensure that the violation was corrected, and (4) controlled a corporation that was charged with, and pleaded guilty to, the same violation. *See Park*, 421 U.S. at 660–65, 95 S.Ct. at 1906–09. All of these elements are present here.

The district court did not, therefore, err by applying the responsible-corporate-offi-cer doctrine to impose criminal liability on Arkell personally.

### DECISION

Because the district court did not err by construing section 16B.69 to be a public-welfare statute, by determining that the statute imposes strict liability, and by applying the responsible-corporate-officer doctrine, we affirm.

**Affirmed.**