STATE of Minnesota, Respondent,

v.

John ARKELL, Appellant, Carriage Homes, Inc., Defendant.

No. C1–02–856.

Supreme Court of Minnesota.

Dec. 31, 2003.

Felhaber, Larson, Fenlon & Vogt, P.A., Eric J. Riensche, Richard A. Beens, Minneapolis, MN, for Appellant.

Attorney General—Criminal, Saint Paul, MN, Baudler, Baudler, Maus & Blahnik, LLP, Lee A. Bjorndal, Austin, MN, for Respondent.

Miriam Elizabeth Stone, Roseville, MN, Amicus Curiae, for Builders Association of the Twin Cities.

Winthrop & Weinstine, P.A., Thomas H. Boyd, Charles (CJ) Schoenwetter, Saint Paul, MN, Amicus Curiae, for Builders Association Minnesota and Builders Association of the Twin Cities.

League of Minnesota Cities, Susan L. Naughton, Saint Paul, MN, Amicus Curiae, for League of Minnesota Cities.

## OPINION

GILBERT, Justice.

This case presents the question of whether alleged building code violations by a contractor, based on the construction work of a subcontractor, should be classified as a strict liability offense that does not require a mens rea element. The facts in this case are undisputed. Carriage Homes was a Minnesota corporation that engaged in multi-family residential and land-development projects. *See State v. Arkell,* 657 N.W.2d 883, 885 (Minn.App. 2003). Appellant John Arkell was chief executive officer, president and sole shareholder of Carriage Homes from 1996 to 1998, at all relevant times to this matter. The corporation employed approximately six people. Appellant had worked on numerous projects through Carriage Homes, including developments in Faribault, St. Cloud, Rochester, and in Wisconsin.

Beginning in 1997, appellant worked with the City of Austin, Minnesota on a new development titled "Southwinds Development." The development consists of a 7–acre parcel of land with 38 residential units. The Austin City Council approved appellant's development plan on June 16, 1997. Appellant signed the Development Agreement on behalf of Carriage Homes. Appellant was involved in the planning of the Southwinds project to a point where he personally spoke with the Austin planning director and appeared at city council meetings. Construction work on Southwinds was subcontracted to several outside companies. The development was substantially completed in 1998. *Id.*

In July and August of 1999, and in June 2001, Craig Hoium, the community development director for the City of Austin, wrote a series of letters to appellant regarding grading, water drainage and roofing problems at the Southwinds Development.[1] Hoium further spoke with the construction supervisor of Southwinds, and other construction managers, but never directly spoke with appellant. Regarding the grading issue, exhibits at trial showed that elevations of certain homes were below grade, causing water to run toward structures. Following snowmelt or during rain conditions, some water pooling occurs in the driveways of certain residential units. After Carriage Homes was notified of the grading problem, it worked to a certain degree to fix the problem. The city inspectors allege that Carriage Homes did not do enough, as drainage issues remain.

Ulland Brothers, a local subcontractor based in Austin, performed the grading on the Southwinds Development. In doing so, Ulland Brothers attempted to implement plans drawn by B.R.W. Engineering, another independent subcontractor. B.R.W. prepared the engineering report, and Ulland performed the grading.[2] Appellant has no involvement or ownership in those entities other than the hiring of them as independent subcontractors. Appellant claims that he had no control over grading or drainage issues because he subcontracted all of those types of construction projects. He further claims that he has no education or experience in engineering.

On May 30, 2001, the state charged Carriage Homes and appellant with three misdemeanor counts each, alleging violations of the Uniform Building Code and thereby both an ordinance violation and a violation

---

1. The letters sent by inspectors to Carriage Homes regarding improper grading were not admitted into evidence and are not part of the record before the court.

2. Charges were not brought against the subcontractors.

of Minn.Stat. 16B.69 (2000).[3] The district court dismissed Counts I and II, relating to alleged defects in roofing. Carriage Homes pleaded guilty to Count III, a charge of violating UBC § 1806.5.5 (1997), a section associated with foundation elevation, and was fined $1,000. *Arkell,* 657 N.W.2d at 886. Appellant pleaded not guilty, arguing that he could not be held personally criminally liable for the violation. After a bench trial, the district court found appellant guilty of Count III and in violation of the city ordinance under the responsible corporate officer doctrine. The responsible corporate officer doctrine allows corporate officers to be found personally liable for a company's violations of a public welfare statute, even if the individuals are unaware of the actual violations. Appellant was sentenced to a fine, to pay restitution to the property owners, and a 90–day jail sentence, with 80 days stayed pending his compliance with the sentencing conditions. *Id.*

The court of appeals affirmed without oral argument. It concluded that Minn. Stat. § 16B.69, which imposes misdemeanor liability for a violation of the State Building Code, is a public welfare statute. *Arkell,* 657 N.W.2d at 887. It reasoned that appellant could be found criminally guilty of a misdemeanor under the responsible corporate officer doctrine. *Id.* at 889–90. The Southwinds Homeowners' Association has submitted a request for restitution.[4] This request was stayed pending the outcome of the present matter. We reverse.

### I.

Minnesota Statutes § 16B.69 states: "A violation of the [building] code is a misdemeanor." Appellant argues that he did not intend to violate the building code, and thought that subcontractors would take care of all regulatory issues. The district court and the court of appeals both concluded appellant's intent to be irrelevant because they held Minn.Stat. 16B.69 to be a public welfare statute that requires strict liability.

■ Statutory construction is a legal determination reviewed under a de novo standard. *See In re A.A.E.,* 590 N.W.2d 773, 776 (Minn.1999). An analysis of a statute must begin with a careful and close examination of the statutory language. *See State v. Orsello,* 554 N.W.2d 70, 74 (Minn.1996). Such a review is undertaken to ascertain and effectuate legislative intent. *See* Minn.Stat. § 645.16 (2002). If the meaning of the statute is "clear and free from all ambiguity, the letter of the law shall not be disregarded under the pretext of pursuing the spirit." *Id.*[5]

■ As we previously recognized, the United States Supreme Court has noted that statutes "concerning 'public welfare' or 'regulatory offenses,' which typically 'regulate potentially harmful or injurious items,' are not subject to a presumption requiring proof of a mens rea to establish

---

3. The building code has been selectively adopted by certain cities in Minnesota. The City of Austin has incorporated the State Building Code into its ordinances. *See* Austin, Minn., City Code § 4.01 (1999). Violation of the State Building Code constitutes a misdemeanor. *See* Minn.Stat. § 16B.69.

4. The restitution request amounts to $238,565.

5. The court of appeals held that Minn.Stat. § 16B.69 is a public welfare statute because it "regulates activities that pervasively affect human health and safety because the State Building Code protects the public's health, safety, and welfare." *Arkell,* 657 N.W.2d at 887. Separately, the court of appeals found that Minn.Stat. § 16B.69 is a strict liability statute that does not contain a mens rea requirement. *Id.*

liability." *See In re C.R.M.*, 611 N.W.2d 802, 805 (Minn.2000) (quoting *Staples v. U.S.*, 511 U.S. 600, 606–07, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994)). Further, we have noted that strict liability statutes are generally disfavored, and legislative intent to impose strict criminal liability must be clear. *In re C.R.M*, 611 N.W.2d at 805. Our determination that the legislature intended to create a strict liability crime can only be reached after a careful and close examination of the statutory language and we are to apply the "rule of lenity" requiring penal statutes to be strictly construed in favor of a criminal defendant. *Id; see State v. Orsello*, 554 N.W.2d 70, 74 (Minn. 1996). However, the rule of strict construction does not require this court to so narrowly interpret a statute that the statute or one of its subdivisions are rendered meaningless. *State v. Zacher*, 504 N.W.2d 468, 473 (Minn.1993).

The Supreme Court has recognized public welfare offenses in limited circumstances. *Staples*, 511 U.S. at 607, 114 S.Ct. 1793. Typically, the Supreme Court recognizes that such offenses involve statutes that regulate potentially harmful or injurious items. In these cases, the Court reasoned "as long as a defendant knows that he is dealing with a dangerous device of a character that places him 'in responsible relation to public danger,' he should be alerted to the probability of strict regulation." *Id.* (citation omitted). The Court noted, however, that "[n]either this Court nor, so far as we are aware, any other has undertaken to delineate a precise line or set forth comprehensive criteria for distinguishing between crimes that require a mental element and crimes that do not." *Id.* at 619–20 (citation omitted). Dangerous devices have included the handling of hand grenades or harmful chemicals, but not the possession of a firearm. *Id.* at 601, 114 S.Ct. 1793.

In *Staples*, the defendant was convicted of possessing an illegal firearm. *Id.* at 600, 114 S.Ct. 1793. The defendant argued that he did not know about the illegal aspects of the firearm. *Id.* The Court held that the government should have been required to prove beyond a reasonable doubt that Staples knew that his rifle had the characteristics that brought it within the statutory definition of a machine gun. *Id.* In contrast to the selling of dangerous drugs, or the possession of grenades, private ownership of guns "has enjoyed a long tradition of being entirely lawful conduct." *Id* at 601, 114 S.Ct. 1793. On the other hand, "one would hardly be surprised to learn that possession of hand grenades is not an innocent act." *Id.* at 609, 114 S.Ct. 1793 (citation omitted). The Court stressed that "public welfare" status only applies in narrow cases, and distinguished these cases from automobile regulations. *Id.* at 614, 114 S.Ct. 1793 ("[W]e probably would hesitate to conclude on the basis of silence that Congress intended a prison term to apply to a car owner whose vehicle's emissions levels, wholly unbeknownst to him, began to exceed legal limits between regular inspection dates.").

We have not previously dealt with the question of strict liability in relation to a building code. Generally, the distinction between strict liability crimes and those requiring a mens rea has been recognized in both our case law and statutes. In *State v. Florine*, 303 Minn. 103, 226 N.W.2d 609, 610 (1975), a defendant was found guilty under Minn.Stat. 152.09, subd. 1(2) (1974), of the felony offense of unlawful possession of cocaine. We noted that "to convict a defendant of unlawful possession of a controlled substance, the state must prove that defendant consciously possessed * * * the substance and that defendant had actual knowledge of the nature of the substance." *Florine*, 226 N.W.2d at 610.

In *State v. Strong*, 294 N.W.2d 319, 320 (Minn.1980), we held that Minn.Stat. 243.55 (1978 Supp.1979), which provided "[a]ny person who brings * * * into any state correctional facility * * * any firearms, weapons or explosives of any kind * * * shall be guilty of a felony," required the state to show that the defendant had knowledge of possession of the offensive item. Further, "most commentators have argued that the legislature should never use strict liability for crimes carrying a sentence of imprisonment and the moral condemnation going with such crimes." *Strong*, 294 N.W.2d at 320 (citing Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* 31 at 218, 223 (1972)).[6]

In *State v. Loge*, 608 N.W.2d 152 (Minn. 2000), a driver of a motor vehicle was cited for driving with open bottles of alcohol in his vehicle. The driver claimed that he did not know bottles were in the vehicle. We held that an open bottle law was a strict liability statute. We went on to note that if knowledge was a necessary element of the open container offense, "there would be a substantial, if not insurmountable, difficulty of proof." *Id.* at 157. In evaluating whether the law required strict liability, we noted that the legislature had inserted the word "knowingly," where intent was required in similar statutes, and this had not been done with the open bottle law. *Id.*

Unlike the open bottle law in *Loge*, the building code does not have separate sections that include words, such as "knowingly," which are indicative of intent. The legislature also provides for an appeals process for violations of the building code, where a person "aggrieved by the final decision of any municipality as to the application of the code * * * may, within 180 days of the decision, appeal to the commissioner." Minn.Stat. § 16B.67 (2002). A provision that allows for appeals of such administrative decisions points toward possible ambiguity in building code requirements and enforcement that are subject to varied interpretation. These aspects raise questions as to whether it could have been intended as a strict liability statute. In *Loge*, we noted a particularly strong public policy rationale in finding strict liability. The same rationale does not exist in the present matter, where construction projects are regulated by building code enforcement officers and proof of an intentional violation is not insurmountable.

■■ Strict liability statutes are generally disfavored, and legislative intent to impose strict criminal liability must be clear. *In re C.R.M.*, 611 N.W.2d at 805. Classifying the building code as a public welfare statute for criminal prosecutions would also set a dangerous precedent. It would allow various municipalities to determine whether mens rea is necessary. As building codes vary between cities and circumstances, and are enforced by local building inspectors, they are distinguishable from those statewide statutes that we have determined to be classified as public welfare statutes. According to a report by the Office of the Legislative Auditor:

[L]ocal building officials have considerable discretion in enforcing and interpreting building code provisions, and this can lead to variation across and within municipalities. * * * Building officials also have considerable discretion in how

---

**6.** The district court sentenced Arkell to 90 days in jail and a $1,000 fine, with 80 days stayed if Arkell paid restitution and met other conditions. The possibility of imprisonment as a result of a building code violation, and

the moral condemnation attached, should be carefully considered when assessing whether the building code is a strict liability statute. *See Strong*, 294 N.W.2d at 320.

they interpret unclear or ambiguous portions of the code.[7]

Importantly, and as an initial matter, we note that unlike other statutes which have been interpreted to impose strict liability such as hand grenades and chemical substances, the legislature has not even imposed the state building code on a statewide basis, which may lead to uneven, disparate enforcement of the state building code.

The present matter illustrates the difficult and varying levels of enforcement of a building code. It was not until 1999, after completion of the project, that the city cited improper grading and began sending letters to Carriage Homes. The complaint alleges a time frame for the violation as "[b]etween July 20, 2000, and April 11, 2001."[8] It remains unclear as to the exact nature of the offense with which Arkell is being charged. The city appears to alternate between, on the one hand charging Arkell with a plain violation of the building code and, on the other hand, a failure to correct the violation once it was cited. Carriage Homes received development approval at various steps, and only a year after completion of construction was the company notified of problems (they were notified by four grading-related letters that were not admitted into evidence). These problems were vaguely described as "grading difficulties" that the drainage situation is not completed and "not all of it" flows correctly. There were no precise measurements introduced, and these letters outlining the complaint were relied

upon to charge criminal violations.[9] In the end, appellant was charged with a crime, apparently because he failed to correct a violation after a significant amount of time had passed between construction and citation.

Further, appellant's corporation did not perform the work that resulted in a building code violation. Instead, it relied on subcontractors and engineers to do their jobs correctly, while employing its own project managers for general supervision. *Arkell,* 657 N.W.2d at 885. Appellant relied on B.R.W. Engineering and Ulland Brothers to properly perform the engineering and grading. The City of Austin approved the Southwinds Development plans, and city inspectors evidently approved the foundation construction, although the city did not have the capacity to independently inspect elevations when the foundations were put into place. Furthermore, the city inspectors, in initially approving the work completed, relied on the same consulting engineer used by Carriage Homes.

Given the facts of this case and the nature of building code violations, it is erroneous to classify appellant's alleged crime as a strict liability offense. We therefore reverse the court of appeals' decision to classify Minn.Stat. § 16B.69 as a public welfare or strict liability statute. In light of our conclusion that Minn.Stat. § 16B.69 is not a public welfare statute, we need not address the issue of Arkell's liability under the responsible corporate offi-

---

**7.** Office of the Legislative Auditor, State of Minnesota, *Program Evaluation Report: Affordable Housing,* Report No. 01–03 at 44 (2001), *available at* http://www.auditor.leg.state.mn.us/ped/pedrep/0103all.pdf (visited December 11, 2003).

**8.** According to the complaint dated May 29, 2001, "[b]etween July 20, 2000, and April 11, 2001, Defendants have not provided adequate

draining, and as a result, have not allowed for proper storm water drainage through the common area."

**9.** We are also concerned that there appears to be an effort to replace civil proceedings by attaching a monetary restitution punishment in lieu of 80 days in jail where a traditional civil remedy was evidently not even sought.

cer doctrine. Consequently, without reaching the merits of this issue, we vacate all findings and holdings by the district court and court of appeals regarding the responsible corporate officer doctrine.

Reversed.